IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:21-CR-58-KAC-DCP |
| | ) | |
| COURTNEY GARVIN PARTIN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. Defendant Courtney Partin moves the Court to suppress the ammunition seized from his person, his statements made at the time of his arrest, and the evidence seized from his home and vehicle, arguing his warrantless seizure violated the Fourth Amendment. In the early morning of November 10, 2020, deputies from the Campbell County Sheriff's Office were dispatched to an address on Stinking Creek Road, in Pioneer, Tennessee, in response to a 9-1-1 call regarding a man in the woods screaming that he was burned and that multiple people had been killed. The deputies located Defendant Partin in a tree in a wooded area behind the caller's property. Once Defendant was on the ground, the deputies attempted to seize him and a fight ensued. The officers tased and subdued Defendant, then arrested him and searched his person incident to his arrest. Defendant argues that the officers violated his Fourth Amendment rights because they lacked probable cause to arrest him for public intoxication on his own rural property and they lacked reasonable suspicion of any crime.

1

After consideration of the evidence and the arguments, the Court finds that based on the exigent circumstances, the officers could detain Defendant to conduct a welfare check. When the officers attempted to detain Defendant, he resisted the officers, who then had probable cause to arrest him for impeding their lawful actions. Accordingly, the Court finds that the officers' seizure and arrest of Defendant Partin did not violate his rights under the Fourth Amendment and respectfully recommends that his motion to suppress be denied.

I. POSITIONS OF THE PARTIES

Defendant Partin is charged with being a felon in possession of a firearm and ammunition on November 10, 2020 [Doc. 1]. This charge arises out of ammunition found on his person at the time of his arrest and a firearm seized during a subsequent search of his vehicle and residence pursuant to a search warrant.

Defendant argues [Doc. 33] that law enforcement lacked probable cause to arrest him for public intoxication because he was not in a public place. He also argues that he was not a danger to himself or others and that he was not annoying others in the area. Defendant asserts that the officers also lacked reasonable suspicion to believe that he was committing any crime. Defendant contends that the other state charges, such as resisting arrest and assault of an officer, flowed from his illegal arrest for public intoxication. He asserts that because his arrest was illegal, the Court must suppress the evidence seized from his person incident to his arrest, his statements, and all evidence flowing from the illegal arrest, to include items seized pursuant to a subsequent search warrant for his home and vehicle.

The Government responds that the officers had reasonable suspicion, based on the 9-1-1 call, to investigate whether individuals were hurt or killed. It asserts that Defendant's refusal to come out of the woods caused the officers to suspect that he may have been involved in criminal

2

Case 3:21-cr-00058-TAV-CRW    Document 43    Filed 10/22/21    Page 2 of 19    PageID #: 145

activity. The Government argues that the officers had reason to detain Defendant for his own and the public's safety. It maintains that when the Defendant resisted their efforts to detain him, the officers had probable cause to arrest him for resisting arrest and assault of a law enforcement officer. Thus, it asserts that the evidence was lawfully discovered during a search incident to Defendant's arrest.

II. SUMMARY OF THE TESTIMONY

The parties appeared before the undersigned on September 21, 2021, for an evidentiary hearing on Defendant's Motion to Suppress [Doc. 33]. Assistant United States Attorney LaToyia T. Carpenter appeared on behalf of the Government. Attorney Michael B. Menefee represented Defendant Partin, who was also present. The Government presented the testimony of Officer Jordan Tolliver of the Caryville Police Department. Defendant presented the testimony of Mr. Danny Broyles.

Officer Tolliver testified that in November 2020, he was a new deputy for the Campbell County Sheriff's Office ("CCSO"). One of his duties was to respond to 9-1-1 calls. Around 5:30 a.m., on November 10, 2020, he was dispatched to 7240 Stinking Creek Road in Pioneer, Tennessee, in response to a 9-1-1 call of a man on the caller's property screaming and causing a disturbance. Officer Tolliver said the caller indicated the incident was in relation to a possible homicide. Officer Tolliver said that in responding to the call, he proceeded with caution because he did not know if the individual causing the disturbance had a weapon. He said prior to responding to this call, he was not familiar with Courtney Partin; however, the other officer on the scene knew Courtney Partin was previously an inmate in the Campbell County Jail.

Officer Tolliver said he and Deputy Joseph Weaver responded to the residence. Officer Tolliver said although it was very dark, he saw a man, whom he later learned was

3

Case 3:21-cr-00058-TAV-CRW   Document 43   Filed 10/22/21   Page 3 of 19   PageID #: 146

Defendant Courtney Partin, in the woods up a hill about forty to fifty feet from the residence. Defendant was moving around and screaming loudly that when the sun rose, he would burn to ashes. Officer Tolliver said he could see the trees moving as Defendant walked back and forth. Officer Tolliver said he and Deputy Weaver, who were both in uniform, announced they were with the CCSO and asked Defendant to come down out of the woods. Defendant responded they would have to come up there and get him and called the officers a profane name.

Officer Tolliver stated that he and Deputy Weaver entered the woods to try to detain the Defendant to determine what was going on. He said as they approached Defendant, he climbed a tree. Defendant had his back to the officers, and they could not see his hands. Officer Tolliver said they ordered Defendant to come down, and Defendant jumped out of the tree. Officer Tolliver said he attempted to detain Defendant Partin for his safety, the safety of the nearby residents, and Defendant's own safety. He said Defendant did not appear to be burned, and he believed that Defendant was "publicly intoxicated." Officer Tolliver said he still did not know whether Defendant had a weapon. Once they moved to detain Defendant, an altercation began. He said he attempted to grab Defendant Partin, who pushed him off. Officer Tolliver testified that he and Deputy Weaver were engaged in an intense struggle with Defendant for fifteen minutes. He said Deputy Weaver assisted in trying to detain Defendant. He said they each had to hold one of Defendant's arms to handcuff him. Based on Defendant's actions, he was charged with assaulting both officers and resisting arrest.

Officer Tolliver testified that in a normal welfare check, he will detain the individual to make sure the individual is ok. He said he would ask questions to determine whether the person needed an ambulance. He said they would normally conduct a pat down for officer safety and safety of the public. He said the situation with Defendant Partin was not normal because

4

of the altercation, which resulted in Defendant's arrest. Officer Tolliver said it is illegal for a person to resist being detained, but Defendant fought them. Officer Tolliver said once they arrested Defendant, he searched Defendant incident to his arrest and found thirteen shotgun shells and fifty rounds of ammunition in Defendant's pockets.

Officer Tolliver said Defendant was taken to CCSO for booking. He said he later learned that 7236 Stinking Creek Road, the property adjacent to the caller's property, belonged to Defendant's family. At the station, officers searched Defendant again and found a pipe in his pocket. Defendant was charged with introduction of contraband into a penal facility and possession of drug paraphernalia based upon the pipe. He also said Defendant was charged with filing a false report or bomb threat for yelling to the caller that he had killed his family. Officer Tolliver agreed that Defendant's family was not harmed. Officers obtained a search warrant to search the residence where Defendant was living, but Officer Tolliver was not aware of what was found.

On cross-examination, Officer Tolliver agreed that officers cannot detain someone without a reason but stated that in the case of Defendant Partin, they had a reason. He agreed that he wrote in the narrative of his arrest report that he and Deputy Weaver believed Defendant was publicly intoxicated. However, he said he and Deputy Weaver decided to detain Defendant upon their arrival based upon Defendant's actions of "frantically running around" and screaming. Officer Tolliver said he wanted to detain Defendant to determine why he was running around and screaming. He said an individual does not have to commit a crime to be detained and that here, they detained Defendant to figure out what was happening. He said he did not believe Defendant was committing a crime when he first arrived but wanted to detain Defendant for officer safety. Officer Tolliver agreed that in his narrative in the Use of Force Report [Exh. 1], he stated that

5

Defendant was detained for public intoxication. He said that based upon what he observed upon arrival, he thought Defendant was publicly intoxicated. However, Officer Tolliver stated that he and Deputy Weaver moved into the woods to see what was happening with Defendant. He agreed that all of Defendant's other charges were based on actions occurring after he observed the Defendant publicly intoxicated.

Officer Tolliver testified that he had been to Stinking Creek Road before that night. He agreed that woods surrounded the caller's house. He believed he was approximately one hundred yards from the road in the woods when he handcuffed Defendant. He estimated that Defendant was roughly ten to fifteen feet from the home of the 9-1-1 caller when handcuffed. Officer Tolliver said Defendant climbed a tree, and when he politely asked Defendant to come down, Defendant jumped down. He said the confrontation with the Defendant lasted about fifteen minutes. He denied that Deputy Weaver deployed a taser on Defendant to get him out of the tree. Deputy Tolliver said the taser was deployed when Defendant was five to ten feet away from the officers and attempting to get away from them. Officer Tolliver said Deputy Weaver deployed the taser twice and that he was not aware where on Defendant's body the taser was deployed.

Officer Tolliver agreed that at 5:55 a.m., he radioed that he was in route to the caller's residence and that at 6:08 a.m., he reported to the dispatcher that they had a male in custody. He stated that later, while Defendant was in custody in the patrol car, he and Deputy Weaver conducted a property check at the Partin residence, twenty-five minutes after Defendant was taken into custody. Officer Tolliver said that neither he nor Deputy Weaver were wearing a body camera that day. He stated that he did not have a body camera, and that his patrol car was not equipped with a camera.

Officer Tolliver stated that he was concerned for officer safety because the 9-1-1 caller had reported that a man said he killed people at the Partin residence. He said he detained Defendant because of his actions and because he was unaware whether Defendant had weapons. He agreed that detaining Defendant Partin did not alleviate his concern that someone had been hurt.

Officer Tolliver agreed that he and Deputy Weaver arrived at the residence at 5:59 a.m. He said he and Deputy Weaver were having problems with their radios that day. He said Deputy Weaver had the female caller call 9-1-1 and remain on the line to relay messages from the officers. He agreed that the officers relayed through the female caller a request for another unit and a request to have Emergency Medical Services ("EMS") on standby. He agreed that following Defendant's arrest, they canceled the ambulance, the request for another unit, and the EMS standby. He agreed that fifteen to twenty minutes elapsed before he and Deputy Weaver checked the Partin residence. He said during that time, the officers searched Defendant incident to his arrest and talked with the 9-1-1 caller and her husband. Officer Tolliver believed they removed the taser probes from Defendant Partin's back.

On redirect examination, Officer Tolliver agreed they detained Defendant for safety reasons and because they wanted to be able to safely investigate whether Defendant was publicly intoxicated. He agreed that when they first attempted to detain Defendant, he actively resisted them and fought them before the taser was deployed. On recross-examination, Officer Tolliver said he wrote his report on the same day as the incident. He agreed that he did not include in the report that he detained Defendant for the safety of others. He did not recall why he did not include that in his report.

Daniel Jerome Broyles testified that he lives at 7240 Stinking Creek Road, that Defendant is his neighbor, and that he and Defendant have talked in passing. He said he lives in a rural area, and Defendant's property is behind his. He said he had been to Defendant's house one time more than twenty years ago to warn Defendant's father about a fire in the woods. Mr. Broyles said on November 10, his wife called 9-1-1. He said Defendant Partin was in the woods behind his house, was acting like he was intoxicated, and was yelling for help. He said he had his wife call 9-1-1, because the Defendant was yelling for help. He said he did not feel like he or his wife were in danger.

Mr. Broyles stated that when the officers arrived, it was dark and he aimed his flashlight into the woods behind his house, so the officers could see where they were going. He said that his dog, which is part rottweiler and part German shepherd, had "treed" Defendant. When the officers arrived, Mr. Broyles put his gun away and put his dog inside his house. Mr. Broyles said the officers tased Defendant Partin while he was still in the tree and that Defendant fell out of the tree. Mr. Broyles said he heard the officers yell "stop resisting" and then he heard the sound of the taser being deployed. He said he did not see Defendant resist the officers at the time he was tased, because Defendant was still in the tree. He said once the Defendant was tased, he fell out of the tree. Mr. Broyles said both deputies were trying to get the Defendant "settled down" and that one deputy (not Officer Tolliver) had Defendant on the ground and was punching him. Mr. Broyles did not see Defendant hit the officer. He said it took the deputies five to ten minutes to remove Defendant from the woods, and during that time, they tased him a second time. He said Defendant kept repeating "I'm sorry."

Mr. Broyles said when Defendant emerged from the woods, he was covered in blood. He said when they put Defendant against the hood of the patrol car, he got blood on the

8

hood. Mr. Broyles said Defendant was bleeding from his face and that he believed Defendant was tased on his face because he could see puncture marks on Defendant's face. Mr. Broyles said that although Defendant appeared to need medical attention, he received none. He believed the deputy who hit Defendant had broken his hand. Mr. Broyles estimated that approximately fifteen to twenty minutes elapsed from the officers placing Defendant against the hood of the patrol car and the officers leaving. He did not know if the officers went to the Partin residence, although they said they would go there as they were leaving.

Mr. Broyles stated that while the Defendant acted like he was intoxicated, he did not look like he was intoxicated. He said Defendant had called out for help and that is why they called 9-1-1. Mr. Broyles said when he walked out with the flashlight, his wife was on the porch, he was twenty to thirty feet away from his house, and Defendant and the officers were another twenty feet up the hill in a wooded area. He said the officers did not tell him or his wife to go inside so they would not be in danger. He said Defendant was arrested 150 to 200 feet from the road. He said Defendant could not be seen from the road.

On cross-examination, Mr. Broyles said Defendant was yelling for help but he did not hear the reason Defendant needed help. He said he heard Defendant say he was "burning up" when he came out of the woods. He said he saw Defendant in a tree after his dog chased Defendant. Mr. Broyles said when the deputies arrived, he got his dog inside and his wife went inside. AUSA Carpenter played the recording of Mrs. Amy Broyles's 9-1-1 call [Exh. 3] reporting a person on her property, that the person was hurt and trying to come through the trees, and that the person said, "Courtney killed everybody up there." Mr. Broyles agreed his wife sounded frightened in the recording. Mr. Broyles agreed that his wife reported the individual in the woods said, "I'm burnt."

9

In the 9-1-1 recording, Mrs. Broyles said that she heard a lot of people at the neighboring house the previous night. In the 9-1-1 call, Mrs. Broyles states that she awakened her husband, who is disabled. Mrs. Broyles states that the man keeps saying that he is burning up and that "Courtney killed everyone." The dispatcher asks if it is Courtney Partin, and Mrs. Broyles replies that the man in the woods is saying that he is burning and "help me." She said that she cannot get to the man, because the brush is too thick behind her house. Mrs. Broyles says she sees a tree moving but she cannot see the man. The dispatcher informs the caller that several officers are on the way. Mrs. Broyles says her dog is outside and that she or her husband will try to catch the dog when the officers arrive. She states that she can see a tree close to her property moving but she cannot see the man because the "overgrowth" is too thick.

Mr. Broyles testified that he bought his house at 7240 Stinking Creek about one year ago. He said the Partin family property is behind his house. He stated that Defendant was already in the tree when the officers arrived. He said he got his dog when the deputies got out of their car. Mr. Broyles testified that his dog is part rottweiler and part German shepherd. He said he was not concerned about himself, but he agreed he was concerned about his wife's safety. The Government resumed playing the recording of the 9-1-1 call, in which Mrs. Broyles states that the dog woke her up jumping on the door wanting out and when she took the dog out, the dog "started going crazy" and the man began yelling. She said she did not hear arguing the previous night, but the man said, "Courtney killed everybody." On the call, Mrs. Broyles said the man keeps saying he is burning and that her husband said if he feels like he is burning, he might have been shot. Upon listening to the recording of the call, Mr. Broyles agreed that he was concerned about his wife's safety and concerned that the person in the tree had been shot.

10

Mr. Broyles said he bought his house a year ago and he had not had his property surveyed. He said the Defendant was chased into a tree by his dog before the officers arrived and remained in the tree when the officers got there. He did not hear the officers tell the Defendant to get out of the tree before they tased him. He said as the deputies went into the woods, they yelled "Sheriff's Department." He said they tased Defendant, while he was in the tree. Mr. Broyles said he was twenty to thirty feet away from the Defendant and the officers, while they were in the woods. He said there were briars and about six saplings between where he stood in the yard and where the officers encountered Defendant. He said the Defendant had climbed a sapling. He said he heard Defendant yelling the officers were hurting him. He said the Defendant was rolling on the ground to get away from the officer beating him. He said he did not see Defendant swing at or hit the officers. He said he had a large flashlight with him, which provides bright light. He agreed the officers struggled to get Defendant's arms behind his back. He said this was after they had tased Defendant a second time. Mr. Broyles said one deputy said his hand hurt, and Mr. Broyles believed this was from punching Defendant Partin.

On redirect examination, Mr. Broyles testified that when his wife awakened him, he got the gun he carries every day. He said he did not think he was in danger unless the man made it to his front door at which point he would have shot the man. Mr. Broyles said he has never had any problems with Defendant Partin and that if he had known it was Defendant in the woods, he would not have called 9-1-1. Instead, he would have gone up to help the Defendant. He said, if the Defendant had not wanted help, he would have told the Defendant to go on up the hill. Mr. Broyles said Defendant was yelling for help.

III. **FINDINGS OF FACT**

The Court makes the following factual findings:

11

Case 3:21-cr-00058-TAV-CRW   Document 43   Filed 10/22/21   Page 11 of 19
PageID #: 154

Around 5:30 a.m., on November 10, 2020, the Campbell County 9-1-1 dispatcher received a call from Amy Broyles, stating there was a man in the woods behind her house, yelling that he was burning, that Courtney Partin had killed everyone, and that he needed help. In response, the dispatcher sent CCSO Deputies Jordan Tolliver and Joseph Weaver to the residence of the caller at 7240 Stinking Creek Road. The residence is in a rural area and is surrounded by woods. Upon arrival, Deputy Tolliver saw Defendant Courtney Partin moving around in the woods approximately forty to fifty feet from the caller's house. Defendant was screaming that when the sun rose, he would burn to ashes. The deputies announced they were with the CCSO and asked Defendant to come out of the woods. Defendant responded that the officers would have to come and get him.

The deputies entered the woods and approached Defendant Partin, who climbed a small tree either before or as the officers entered the woods. Defendant jumped or fell out of the tree, and the deputies attempted to lay hands on Defendant to detain him. Defendant Partin pushed the officers away and began fighting the deputies. The struggle lasted fifteen minutes, during which time Deputy Weaver deployed a taser on Defendant twice. Ultimately, the deputies handcuffed Defendant Partin, brought him out of the woods, and placed him against the hood of the patrol car. Defendant was bleeding. The officers searched Defendant and found ammunition in his pockets. Defendant was then placed in the patrol car. Approximately, twenty-five minutes after bringing Defendant out of the woods, the deputies checked the Partin family residence, which was located through the woods behind the caller's home. No one was present at the Partin residence.

12

## IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures of their "persons, houses, papers, and effects." U.S. Const. amend IV. "The simple language of the Amendment applies equally to seizures of persons and to seizures of property." *Payton v. New York*, 445 U.S. 573, 587 (1980). At the heart of the Fourth Amendment's protection is a person's right to be free from "'unreasonable governmental intrusion'" in his or her own home. *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). In the instant case, the evidence is not clear whether Defendant was on his own property or the Broyles's property when he was seized.[1] However, the protections of the Fourth Amendment extend to his person at either location. *See Brendlin v. California*, 551 U.S. 249, 262-63 (2007) (holding that a passenger can challenge the propriety of a traffic stop of another's vehicle, because he was seized at the time of the stop).

Defendant argues that the officers did not have probable cause to arrest him for public intoxication, because he was not in a public place. *See* Tenn. Code Ann. §§ 39-17-310(a) (proscribing intoxication in a "public place" to a degree that endangers oneself, others, or property or "unreasonably annoys" others in the area); 39-11-106-106(a)(31) (defining "public place"). The

---

[1] Mr. Broyles testified that he had bought 7240 Stinking Creek Road one year ago, which would be approximately one month before the November 10, 2020 incident. He said he had not had the property surveyed and that he had removed some of the trees from the area near where the deputies encountered Defendant. This testimony suggests that Defendant was near the property line between his and his neighbor's property. Even assuming that Defendant was in the woods on his own property, the evidence before the Court reveals he was not within the curtilage of his residence but, instead, was in a wooded area at the far edge of his property. The Fourth Amendment protections afforded to one's residence and curtilage are not "extended to the open fields." *Oliver v. United States*, 466 U.S. 170, 176 (1984); *United States v. Rigsby*, 943 F.2d 631, 636 (6th Cir. 1991), *cert. denied*, 503 U.S. 908 (1992). "The open fields doctrine does not require the area to be open or a field, but includes thickly wooded areas as well." *Id.* Thus, the Court analyzes the propriety of the seizure of Defendant's person, not whether the deputies could enter the woods to seize him.

13

Court agrees but finds that does not conclude the Fourth Amendment analysis in this case. The Government contends that the officers could detain Defendant Partin because they had reasonable suspicion to believe that someone or multiple people had been hurt. "[A] brief investigative stop, or *Terry* stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)) (other citations omitted). Defendant argues that Deputies Tolliver and Weaver lacked reasonable suspicion to conduct a *Terry* stop because they were not investigating a crime. He contends they could not reasonably suspect him of public intoxication, which is the crime alleged in the police report, because he was not in a public place.

The Court finds that neither of these theories—probable cause regarding public intoxication or reasonable suspicion of another crime—fit the unique circumstances of this case. Instead, the Court examines whether the deputies could detain Defendant based on the exigent circumstances and whether that detention escalated into probable cause to arrest him.

"[L]aw enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (quoting *Kentucky v. King*, 563 U.S. 452, 460, 470 (2011)). This "emergency aid exception" to the warrant requirement does not turn upon "the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises" but, instead, arises when there is an "objectively reasonable basis for believing" that an individual on the property needs "immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009), *see also Johnson v. Memphis*,

14

617 F.3d 864, 868 (6th Cir. 2010) (recognizing the emergency aid exception as a basis for law enforcement's warrantless entry of a home due to exigent circumstances).

In *Fisher*, officers responding to a report of a "disturbance," arrived on the scene to find the defendant "screaming and throwing things" inside the home, along with a wrecked vehicle and small amount of blood on the hood of the vehicle in the driveway. 558 U.S. at 45-46. The defendant declined to open the door to the officers and, when they asked if he needed medical aid, he "demanded, with accompanying profanity, that the officers go get a search warrant." *Id.* at 46. When an officer forced open the door, the defendant pointed a gun at him, an act which precipitated subsequent charges for assault with a dangerous weapon and possession of a firearm during a felony. *Id.* at 47. The Court held that the officers reasonably entered the home under the emergency aid exception, observing "it was reasonable to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." *Id.* at 49.

Although the emergency aid exception is typically applied to the warrantless entry of a residence, here the Court finds that it also applies to the temporary warrantless seizure of an individual. The Court finds that exigent circumstances existed for the deputies to approach Defendant and determine whether he needed emergency assistance. Law enforcement received a 9-1-1 call from a distressed neighbor stating that a man in the woods was yelling that he was burning and that others had been killed and was calling repeatedly for help. *See Johnson*, 617 F.3d at 870-71 (observing that a 9-1-1 call is strong evidence of an emergency, given that the fraudulent use of 9-1-1 is a misdemeanor in most communities). Upon arriving at the property, the deputies heard a man screaming from the wooded area that he was burning and that, when the sun came up, he would turn to ashes. Deputy Tolliver said the man, whom he later learned was Defendant Partin,

15

was running back and forth in the woods and that the deputies could not tell if he was armed or injured. When the deputies informed Defendant they were law enforcement and asked him to come out of the woods, the Defendant responded belligerently and with accompanying profanity that the officers would have to come get him. The Court finds that the officers could properly approach and detain Defendant Partin to investigate his condition based on a reasonable belief that Defendant needed immediate medical attention.

The Court also finds the deputies could properly detain Defendant to determine whether he was injured or possibly a danger to others under their community caretaking function. In discussing the automobile exception to the warrant requirement of the Fourth Amendment, the Supreme Court observed that law enforcement officers often "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Relying on this language from *Cady*, our appellate court determined the community caretaking function of the police permitted an officer to stop and question an individual without a warrant or reasonable suspicion in order to locate a minor who could be in danger. *United States v. Brown*, 447 F. App'x 706, 709-10 (6th Cir. 2012) (unpubl'd); *see also United States v. Lewis*, 869 F.3d 460, 463-64 (6th Cir. 2017) (applying the community caretaking function). "No Fourth Amendment violation results when an immediate caretaking interest justifiably compels an officer's intrusions." *Brown*, 447 F. App'x at 710. The court concluded that the Fourth Amendment's requirement of reasonableness would prevent the "caretaking exception" from improperly enlarging the government's seizure authority. *Id.*

The community caretaking exception applies when (1) the officer is not engaged in detection, investigation, or evidence gathering in relation to a crime, (2) the officer's actions are

reasonable under the circumstances, and (3) often there is a risk of danger to the officer or others. *Shoup v. Doyle*, 974 F. Supp. 2d 1058, 1074 (S.D. Ohio 2013). A detention under the community caretaking function must be limited in duration, continuing only long as necessary to achieve its purpose, and in scope, which should be suited to the underlying reason for the stop. *United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005). "Once the officer has completed the inquiry necessary to satisfy the purpose of the initial detention, he or she must allow the person to proceed unless the officer has reasonable suspicion of criminal conduct." *Id.*

In the instant case, the deputies' attempted to detain Defendant Partin to determine whether he was injured and the cause of his distress. The Court finds this is an appropriate exercise of the deputies' community caretaking function. The deputies were not gathering evidence of a crime but were instead investigating Defendant's condition. A brief investigatory detention was reasonable under the circumstances. Additionally, the Court finds there was a risk of danger to others and to the officers, given the Defendant's reported statements that someone had killed others. However, the deputies' attempt to detain Defendant to assess his condition was thwarted, first by Defendant's attempt to flee and second by his resisting detention. Officer Tolliver testified that as they approached Defendant through the woods, he climbed a tree to evade them.[2] Defendant either jumped or fell from the tree, and when Officer Tolliver attempted to grab him, Defendant pushed him away and began fighting with the officers. The Court finds that when the officers attempted to detain Defendant to investigate his condition, Defendant resisted detention.

---

[2] Although Mr. Broyles testified that Defendant was chased into a tree by his dog and was still in the tree when the officers arrived, the Court finds that Mr. Broyles caught his dog and put it inside his house when the deputies arrived. The Court finds Deputy Tolliver's testimony that Defendant was moving back and forth in the woods, when the deputies approached the back of the Broyles's property to be credible and not inconsistent with Defendant previously being in a tree.

At that point and, certainly, when Defendant began fighting with the officers, they had probable cause to arrest him for obstructing the detention.

"It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . . from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another." Tenn. Code Ann. § 39-16-602(a). Obstructing a law enforcement officer is a Class B misdemeanor. Tenn. Code Ann. § 39-16-602(d). Officer Tolliver testified that he and Deputy Weaver attempted to stop and frisk Defendant Partin, but Partin forcibly resisted first by pushing him away and then by fighting with the officers. While Mr. Broyles testified he did not see Defendant Partin resist or hit the officers, the Court questions whether Mr. Broyles had a clear view of the altercation between Defendant and the officers. Instead, the Court finds the altercation occurred on the ground forty to fifty feet into the woods, and Mr. Broyles's view was obstructed by brush, briars, and undergrowth. Furthermore, it was dark, and despite having a large flashlight, Mr. Broyles admitted he could not identify the man in the woods as Defendant Partin. Accordingly, the Court finds that the deputies had probable cause to arrest Defendant Partin for obstructing the deputies' attempt to detain him in furtherance of their lawful duties, i.e., investigating his condition and the cause of his distress. *See Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) (holding an officer with probable cause may arrest a person for a misdemeanor committed in his or her presence).

In summary, the Court finds the CCSO deputies could properly stop and detain Defendant Partin, without probable cause or reasonable suspicion, due to the exigent circumstances and to investigate his condition under their community caretaking function. When the deputies attempted to detain Defendant, he obstructed the detention by pushing them away and

then fighting with them. At that point, the officers had probable cause to arrest Defendant for obstructing the detention. The Court finds that the deputies' attempted detention and ultimate arrest of Defendant Partin did not violate the Fourth Amendment.

V.     **CONCLUSION**

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds no basis to suppress the evidence resulting from the arrest and search of Defendant. For the reasons set forth herein, the Court **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 33] be **DENIED**.[3]

Respectfully submitted,

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Judge need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).