UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:   3:21-CR-58-TAV-CRW |
| | ) | |
| COURTNEY GARVIN PARTIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This criminal matter is before the Court for consideration of the Report and Recommendation ("R&R") entered by United States Magistrate Judge Cynthia R. Wyrick on January 3, 2025 [Doc. 203]. The R&R addresses defendant's Supplemental Motion to Suppress Evidence [Doc. 187],[1] incorporating by reference defendant's earlier pro se Motion to Suppress [Doc. 101]. The government responded to both motions [Doc. 195]. Judge Wyrick held a hearing to address these motions on November 4, 2024 [*see* Docs. 198, 199] and took the motions under advisement. Judge Wyrick then issued the R&R [Doc. 203], recommending that the Court deny defendant's motions to suppress [Docs. 101, 187].

Defendant has filed objections to the R&R [Doc. 205], and the government has responded [Doc. 215]. The matter is now ripe for review. *See* E.D. Tenn. L.R. 7.1(a). For

---

[1]  As the R&R mentions, this motion includes a request that the Court vacate its prior rulings [Docs. 43, 67].

the reasons below, the Court **MODIFIES in part** and **ACCEPTS in part** the R&R [Doc. 203] and **DENIES** defendant's motions to suppress [Doc. 101, 187].

## I.    Background

The Court presumes familiarity with the background and the summary of the testimony set forth in the R&R [*See* Doc. 203, pp. 1–10]. As neither party has objected to this portion of the R&R,[2] the Court incorporates it below:

### A.    Relevant Background

Defendant was initially arrested by the Campbell County Sheriff's Department on November 10, 2020, and charged with resisting arrest, assault on an officer, possession of drug paraphernalia, and possession of a firearm by a convicted felon. At the time of his arrest, Defendant was behaving in a way that raised concerns regarding his mental health. Specifically, Defendant had climbed a tree and was screaming that he had murdered his family and that he was burning and when the sun came out, he would turn to ashes. Defendant was subsequently indicted in federal court on May 11, 2021, and charged with being a felon in possession of a firearm and ammunition. This indictment arose from the same incident that led to Defendant's arrest by the Campbell County Sheriff's Department.

At his initial appearance on May 17, 2021, the court appointed Assistant Federal Defender Stephen A. Ferrell to represent Defendant, and Defendant's trial was scheduled for July 20, 2021. On June 11, 2021, Defendant's counsel filed a motion for a psychiatric or psychological evaluation of Defendant pursuant to 18 U.S.C. § 4241-42, stating that counsel had concerns regarding Defendant's ability to discuss his case with counsel. A few days later, Defendant filed a pro se motion for new counsel. In this motion, Defendant asserted that he was provided the wrong discovery and that his current counsel was ineffective. The court granted Defendant's request and appointed attorney Michael Menefee ("Mr. Menefee") to represent Defendant going forward. Shortly after Mr. Menefee was appointed, he contacted the Assistant United States Attorney assigned to Defendant's case, via email, and advised that some of the discovery that had been provided appeared unrelated to Defendant's case. In addition, counsel requested

_____

[2] The Court acknowledges defendant objects to some of the findings of fact contained in the R&R [*See* Doc. 205, pp. 6–7]. The Court addresses such objections *infra*.

2

specific items of discovery, if they existed, including any audio or video recording of the statement Defendant made to law enforcement on November 10, 2020, and any medical records from the Campbell County Jail regarding medication administered to Defendant following his arrest. Additionally, Mr. Menefee filed a Motion to Suppress Evidence and a Motion to Withdraw the motion for psychiatric or psychological examination.

An evidentiary hearing to address Defendant's Motion to Suppress Evidence was held on September 21, 2021. The court also addressed Defendant's request to withdraw the motion his former counsel had filed asking that Defendant undergo a psychiatric or psychological examination. The court ultimately permitted Defendant to withdraw the motion filed by his former counsel requesting that Defendant undergo a competency evaluation. In its order addressing the issue, the court noted that Defendant's present counsel had stated that Defendant appeared to understand the charges against him and the potential consequences and had been able to communicate with counsel and assist in his defense.

A report and recommendation recommending the denial of Defendant's Motion to Suppress was subsequently filed on October 22, 2021. Defendant objected to the recommendation, but the District Court overruled Defendant's objection and denied the motion to suppress. On January 25, 2022, after the suppression hearing had been held and the report and recommendation issued, the United States provided a notice to defense counsel that supplemental discovery was available in Defendant's case and produced approximately 37 photographs taken on or about November 10, 2020, during a search of Defendant's home, and an audio recording of Defendant's statement made to law enforcement officers on November 11, 2020. A few days later, on February 2, 2022, the United States produced records from the Campbell County Sheriff's Office's medical department describing injuries on Defendant's person when he arrived at the jail and stating that Defendant was administered Haldol because he was experiencing psychosis and chest pain. A status conference was held before the District Court on February 4, 2022. Following the status conference, the District Court issued an order resetting Defendant's trial for February 22, 2022, and setting deadlines for the parties to file supplemental material related to the motion to suppress and to respond to other recently filed motions. However, on May 17, 2022, during a hearing to address Defendant's latest request for new counsel, he made statements that gave the court reason to question his competency to stand trial, so Defendant was ordered to undergo a mental examination and evaluation to determine his competency to stand trial pursuant to 18 U.S.C. § 4241(b), and the court then canceled all deadlines

and the trial date. Defendant was initially found to be incompetent. but his competency was ultimately restored.

Because of the unique circumstances of this case, the court reopened both pretrial motions and the hearing on Defendant's suppression motion. Multiple dates were set and continued as Defendant underwent the competency evaluation and restoration process, but once Defendant's competency was restored, the court held a scheduling conference resetting the trial date and deadlines in this matter. Defendant then filed supplemental motions to dismiss and suppress evidence which are now pending before this court. A hearing to address all pending motions to suppress and dismiss was held before the undersigned on November 4, 2024. As part of this hearing, the court permitted Defendant to present additional testimony to supplement what was presented during the suppression hearing held on September 21, 2021, but with the caveat that he could only present new evidence that was not available to him as of the date of the original hearing.

[Doc. 203, pp. 1–5 (citations and footnotes omitted)].

## B.    Summary of Testimony

### i.    Agent Elkins

During the reopened suppression hearing, the United States called Tennessee Bureau of Investigation ("TBI") Special Agent Brandon Elkins ("Agent Elkins") to testify regarding the statement Defendant gave to law enforcement following his arrest. Agent Elkins explained that he assisted Campbell County Sheriff's Department ("CCSD") Captain John Long ("Captain Long") with Defendant's interview which took place in Captain Long's office at the CCSD on November 11, 2020, at approximately 11:00 a.m. and lasted about an hour. Agent Elkins testified that he would not interview a suspect who appeared to be intoxicated or incompetent and advised that he looks for any signs of impairment, such as sweating, drowsiness, inability to speak clearly, or difficulty with providing details during an interview. Agent Elkins further testified that he did not observe any indication that Defendant was intoxicated or incompetent before or during his interview. He described Defendant's demeanor as tired and frustrated but not rude or combative. Agent Elkins stated that Defendant was not sweating or drowsy, did not have slurred speech, and did not express any reluctance to speak to law enforcement officers. To the contrary, Defendant expressed a desire to "tell his story." At the same time, Agent Elkins acknowledged that Defendant told him and Captain Long that he may have been drugged prior to his arrest and stated he was having trouble discerning

4

what happened leading up to and during his arrest. Agent Elkins further stated that Defendant relayed some potentially delusional thoughts, such as that he thought he had died and been brought back to life. Still, Agent Elkins testified that Defendant was able to speak clearly and provide specific details regarding his actions. Specifically, Agent Elkins testified that during the interview Defendant discussed going to his mother's house in the late hours of November 9, 2020 or early hours of November 10, 2020 and entering by breaking a window. Defendant stated that while there, he took three sandwiches, a gallon of milk, and a firearm. Further, Agent Elkins testified that despite expressing some strange beliefs, Defendant was able to distinguish between those beliefs and reality and understood that his statement could be used against him. Agent Elkins also testified that it was important to his assessment of Defendant's ability to give a statement that all of the seemingly delusional statements made by Defendant related to prior events, not what was happening during the interview.

On cross examination, Agent Elkins agreed that Defendant appeared to have "half a haircut" during the interview. Agent Elkins advised that he questioned Defendant during the interview about the condition of his hair, and Defendant told him that he was attacked or drugged while he was cutting it, so he was unable to finish. He also admitted that Defendant did have some visible injuries on his person. Agent Elkins specifically recalled Defendant having a black eye, a swollen wrist, and some scrapes on his forehead, and further remembered Defendant complaining of wrist pain. Agent Elkins did not recall seeing any taser wounds on Defendant's body and did not remember Defendant saying anything about falling out of a tree. Agent Elkins did remember Captain Long saying that Defendant had received an injection of some medication from the nurse when he came into the jail, but it had been around 24 hours since the medication was administered. Agent Elkins reiterated that his personal observations of Defendant during the interview led him to conclude that Defendant was lucid throughout the process. In addition to providing a statement to police, Defendant also gave consent for his property to be searched and signed a form memorializing this consent.

[*Id.* at 5–7 (footnotes omitted)].

### ii.    Captain Long

Defendant called Captain Long as his first witness during the hearing. Captain Long testified that he was familiar with Defendant before the November 11, 2020 interview and knew that Defendant had a previous felony conviction. He confirmed that he participated in the November 11,

2020 interview of Defendant along with Agent Elkins. Captain Long testified that before the interview he had spoken to the arresting officers about the events surrounding Defendant's arrest and had been advised there was a physical altercation between them and Defendant where a taser was used. He also testified that he knew Defendant had been placed in a restraint chair after he arrived at the Campbell County Jail but did not know that Defendant had been given Haldol. Captain Long further stated that before asking Defendant any questions, he advised him of his Miranda rights, which Defendant waived. Defendant asked them if they would help him if he talked to them, to which Captain Long replied that it depended on what Defendant told them.

Captain Long's description of Defendant's physical appearance largely matched that of Agent Elkins, and he did not see obvious taser marks on Defendant's person either. He did not recall if he had been advised that Defendant had fallen out of a tree. Captain Long's testimony also corroborated that of Agent Elkins regarding the delusional statements made by Defendant during the interview being about past events, and there being no signs that Defendant was intoxicated or incompetent. Specifically, he testified that Defendant knew where he was and why he was there, was speaking clearly, and provided appropriate answers to the questions he was asked. Captain Long noted that he independently corroborated some of Defendant's answers, while acknowledging that Defendant also expressed some strange beliefs during the interview. Specifically, Captain Long explained that Defendant stated he had broken a window to enter his mother's house and removed a firearm which law enforcement verified during a search of the mother's home. Captain Long further testified that early in the interview Defendant acknowledged that he knew he was not supposed to be around firearms.

[*Id.* at 7–8].

### iii. Joseph Weaver

Defendant called former Campbell County Sheriff's Deputy Joseph Weaver ("Mr. Weaver") as his final witness. Mr. Weaver testified that he received a call from Campbell County dispatch regarding an issue on Stinking Creek Road but was unable to recall whether the call was regarding potential illegal activity or a health and safety concern. Mr. Weaver testified that he and Deputy Jordan Tolliver were both at the Subway near interstate exit 141 when the call came in and both responded. Mr. Weaver stated that Deputy Tolliver arrived first to the scene, and then he arrived a short time later and acted in the role of assisting officer. Accordingly, Mr. Weaver testified that it was possible Deputy Tolliver observed things that he did not. Mr. Weaver

6

testified that when he arrived on the scene, he saw a man and woman outside and heard screaming coming from the woods. Mr. Weaver testified that when he looked into the woods, he saw Defendant in a tree, approximately 12 to 15 feet off the ground. Mr. Weaver testified that Defendant yelled some profanity and said something to the effect that officers should "come and get him." According to his testimony, Mr. Weaver and Deputy Tolliver walked into the woods to Defendant's location. Mr. Weaver further testified that upon approaching Defendant, he appeared to be heavily intoxicated and incoherent. Mr. Weaver stated that when he and Deputy Tolliver gave Defendant verbal commands to come down from the tree, he did not comply, was uncooperative and actively resisted officers' efforts to determine if he was okay and to ascertain the nature of the situation. Mr. Weaver testified that Defendant subsequently fell from the tree.

Mr. Weaver explained that after Defendant fell, he got up off the ground and began fighting him and Officer Tolliver. Mr. Weaver confirmed that during the ensuing altercation he struck Defendant with a closed fist multiple times. Mr. Weaver also testified that he deployed his taser once during the altercation. Mr. Weaver did not recall where on Defendant's body the taser struck or how many volts were used but did recall that Defendant was not tased while he was in the tree. Mr. Weaver also testified that Defendant continued to resist officers after he had been tased. He testified that he did not receive any injuries during the altercation with Defendant and did not recall whether Defendant ever actually struck him or how long the altercation lasted. At the same time, Mr. Weaver testified that the altercation probably lasted several minutes during which he was in fear for his own safety, advising that it was because of this fear for his safety that he struck Defendant. Mr. Weaver also advised that Deputy Tolliver made the decision to place Defendant under arrest but did not recall who searched Defendant's person once he was subdued.

[*Id.* at 8–10 (footnote omitted)].

## C.   Findings of Fact

While the parties have expressed no objections to the above background and testimony summary, defendant has lodged two objections to the R&R's findings of fact [*See* Doc. 205, pp. 6–7]. For reasons explained *infra*, these objections are overruled, and as such, the Court incorporates the R&R's findings of fact in full below:

7

The court finds that the testimony regarding Defendant's arrest that was presented during the supplemental suppression hearing largely corroborates the testimony given during the original suppression hearing before Magistrate Judge Poplin. Accordingly, as to the facts surrounding Defendant's arrest, the undersigned adopts the findings of fact in the Report and Recommendation issued by Judge Poplin. The court makes the additional findings of fact set forth below related to Defendant's statement to law enforcement and the search of his property:

Defendant was arrested in the early hours of November 10, 2020, and taken to the Campbell County Jail. Defendant was placed into a holding cell and began banging on the window, screaming, and threatening to harm officers if they did not let him out of the cell. Defendant did not respond to officers' verbal commands to sit down and stop screaming, and at approximately 10:30 a.m. officers decided to place Defendant in a restrain chair for his safety and the safety of others in the facility. Medical staff was notified, and a nurse came to check on Defendant. Around 11:00 a.m., nursing staff administered a 5 mg injection of Haldol to help Defendant calm down and to reduce his blood pressure. After Defendant became calm, medical staff was able to examine him physically and noted a cut on his cheek, which they cleaned and bandaged. Defendant's jaw was also x-rayed.

Approximately 24 hours later, at around 11:00 a.m. on November 11, 2020, Agent Elkins and Captain Long conducted an interview of Defendant. Before the interview began, Captain Long advised Defendant of his Miranda rights, and Defendant agreed to speak with officers. Throughout the roughly hour-long interview, Defendant did not exhibit any signs of physical distress or an inability to understand officers' questions. He spoke clearly and answered questions with an appropriate level of detail. Defendant was calm and his tone of voice was even. Similarly, Agent Elkins and Captain Long were not aggressive in their questioning of Defendant. Even after the interview had begun, Defendant was reminded that he did not have to answer questions if he did not want to, but Defendant stated that he did. Importantly, Defendant clearly articulated to Captain Long and Agent Elkins his understanding that he should not have had a firearm and ammunition and asked them if they would help him if he talked to them, to which Captain Long replied that it depended on what Defendant told them.

Defendant stated that he believed he had been drugged prior to his arrest and, as a result, had been "out of his mind" when he was arrested. He also told officers that he knew he had been acting out after he arrived at the jail and remembered that the nurse had come to see him and given him a shot to help him sleep. Defendant described experiencing strange things leading up to his

arrest, like seeing blood on a leaf that was trying to tell him different things about souls. Defendant also expressed concern about his mother and asked officers to check on her to make sure she had not been harmed. At the same time, Defendant also stated that he did not believe everything he saw was true and accurate and stated he thought he had been hallucinating as the result of a drug he had been given. Defendant even went to so far as to suggest to officers that he be drug tested to see what was in his system that could have caused him to hallucinate or see things only in his mind. Defendant did not state that he was seeing or experiencing anything strange or impossible at the time of the interview. Defendant remembered that he did not call the police the day before and advised officers that someone else had called. Defendant was able to view a map of his property and his neighbors' property and describe structures on the property as well as their contents. Defendant was also able to provide his mother's address and give a detailed account of forcibly entering his mother's house by breaking her bedroom window, recalling that he had cut his head on the broken glass and showing the cut to officers. Defendant described the specific items he removed from his mother's home: a .22 pistol, 12-gauge ammunition, a gallon of milk, and three sandwiches. Despite taking a gun from his mother's house, Defendant stated that he did not fire any shots, and no one was harmed.

Defendant acknowledged that he had been in a delusional state of mind leading up to his arrest, stating that there were "bodies" on his property near his neighbor's property line and believed that his neighbor had put them there. He also told officers that if there were bodies there, he would like for officers to take him to the bodies so he could free their souls. Captain Long and Agent Elkins asked if they could search Defendant's property, and Defendant consented to the search without hesitation. Defendant signed a consent to search form, but cautioned officers that because the property was technically in his mother's name, her consent may also be needed.

Of note, before Defendant and his mother provided this consent, law enforcement had already obtained a warrant to search Defendant's property. The warrant was based upon the affidavit of Captain Long and it authorized a search of Defendant's residence at 7236 Stinking Creek Road, Pioneer, Tennessee for firearms and/or ammunition which Defendant, as a convicted felon, was unable to legally possess. During this search of Defendant's property, law enforcement located and seized ammunition and a shotgun.

[Doc. 205, pp. 10–13 (citations and footnotes omitted); *see* Doc. 43, p. 12].

9

Defendant moves to suppress the evidence found on his person when he was arrested, the evidence found in his home pursuant to a search warrant issued following his arrest, and his post-arrest statement obtained on November 11, 2020 [Docs. 101, 187]. In support of his motions, defendant makes four, overall arguments: (1) he was illegally seized when he was arrested, which, consequently, entitles him to have all evidence flowing from that arrest suppressed as fruit of the poisonous tree; (2) the search warrant for his property was not supported by probable cause, making it invalid, and thus, any evidence obtained during the search should be suppressed; (3) the officers who arrested him used excessive force and therefore, all evidence the government is offering should be suppressed; and (4) the statement he made to law enforcement officers was obtained in violation of his rights pursuant to the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966), and in turn, it must be suppressed [Docs. 101, 187].

In response, the government contends that defendant's motions should be denied because (1) law enforcement had legitimate reasons for being on defendant's property; (2) law enforcement conducted a reasonable search of defendant's property; (3) law enforcement searched defendant's property after obtaining a warrant based on probable cause; and (4) law enforcement provided defendant with appropriate *Miranda* warnings which defendant waived [Doc. 195].

Upon consideration of the record and the parties' arguments, including those made at the November 4, 2024, hearing, Judge Wyrick has recommended that the Court deny defendant's motions to suppress [Docs. 101, 187]. First, Judge Wyrick determined that defendant's detention and subsequent arrest did not violate his rights under the Fourth

10

Amendment and recommended that the Court deny defendant's request to have the Court vacate its prior rulings to suppress evidence on these grounds [Doc. 203, p. 14]. Second, Judge Wyrick concluded that probable cause existed to support the issuance of a search warrant and, even if probable cause did not exist to support the issuance of a search warrant, law enforcement officers "were still entitled to reasonably rely on the validity of the search warrant and any evidence seized as a result is not subject to suppression" [*Id.* at 17]. Third, in consideration of defendant's excessive-use-of-force argument, Judge Wyrick found that law enforcement did not use excessive force under the circumstances [*Id.* at 19]. And moreover, "the appropriate remedy for use of excessive force is a civil action pursuant to 42 U.S.C. § 1983" [*Id.*]. Finally, Judge Wyrick concluded that defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights before providing a statement to law enforcement [*Id.* at 28].

## II.    Standard of Review

The Court reviews *de novo* those portions of the R&R to which a defendant has objected. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Accordingly, the Court considers the defendant's motion to dismiss the indictment, the government's response and supplement, the parties' post-hearing briefing, the R&R, defendant's objections, and the government's response to those objections, all in light of the applicable law.

Objections to any part of a magistrate judge's disposition "must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see also Thomas v. Arn*, 474 U.S. 140, 147 (1985) (stating that the purpose of the rule is to "focus attention on those issues . . . that

are at the heart of the parties' dispute"). Each objection to a magistrate judge's recommendation should describe how the analysis is wrong, why it was wrong, and how *de novo* review warrants a different result on a particular issue. *See Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). A general objection that merely restates an argument previously presented or simply voices a disagreement with a magistrate judge's suggested resolution "has the same effects as would a failure to object." *Austin v. Comm'r of Soc. Sec.*, No. 1:19-cv-2380, 2021 WL 1540389, at *4 (N.D. Ohio, Apr. 19, 2021) (citations omitted); *see also United States v. Dawson*, No. 4:19-cr-206, 2020 WL 109137, at *1 (N.D. Ohio, Jan. 9, 2020) ("[T]he Court is under no obligation to review *de novo* objections that are merely an attempt to have the district court reexamine the same arguments set forth in the petition and briefs.").

### III. Analysis

As an initial matter, defendant objects to the limitation of testimony presented at the suppression hearing [Doc. 205, p. 3]. Defendant states that the November 4, 2024, suppression hearing was limited based on the fact that a suppression hearing had already taken place [*Id.*]. As a result, defendant contends that the totality of circumstances in this case warrant "a completely new hearing without limitation" [*Id.*]. "A court 'should be extremely reluctant to grant reopenings.'" *United States v. Thompson*, 580 F. Supp. 3d 503, 506 (citation omitted). Generally, the reopening of a suppression hearing is unwarranted "absent any new evidence or evidence that was unobtainable before the original suppression hearing, or any new issues that became relevant since the initial hearing." *United States v. Baker*, No. CV 09-20068, 2011 WL 13142576, at *2 (W.D.

12

Tenn. Dec. 1, 2011), *aff'd,* 562 F. App'x 447 (6th Cir. 2014) (citation omitted). Here, defendant does not argue that new or previously unobtainable evidence has now come to light or that new issues have become relevant since the November 4, 2024, hearing. Instead, defendant disagrees with the limitation of the second suppression hearing to arguments and evidence not already presented to the Court. Thus, finding no reason to reopen the suppression hearing, the Court **OVERRULES** defendant's objection here.

Moving forward, and as stated above (*see supra* Section I(C)), defendant makes two objections to the R&R's findings of facts [Doc. 205, pp. 6–7].[3] First, defendant objects to the R&R's statement that "during the interview, [defendant] did not exhibit any signs of 'physical distress'" [*Id.* at 6 (citing Doc. 203, p. 11, n.16)].[4] In support of this objection, defendant argues that "it is undisputed that during the prior 24 hours[,] [defendant] had been assaulted by two police officers, tased, restrained in a chair, and forcibly medicated all at the hands of the Campbell County Sheriff's Office" [*Id.*]. Further, defendant submits that Captain Long and Agent Elkins acknowledged defendant's appearance and noted his injuries in the interview [*Id.*].

---

[3] While the government does not specifically address defendant's objections to the findings of fact, it does note nine conclusions of which defendant expresses no objection, arguing that these conclusions are well-founded, and the Court should adopt them [Doc. 215, pp. 4–5].

[4] As the Court did not include footnotes in its earlier reiteration of the R&R's findings of fact, and defendant's objection includes reference to footnote 16, the Court finds it appropriate to quote it here: "Defendant did exhibit physical injuries, including a black eye, a slightly swollen wrist, and scratches. Defendant stated he was tased 'several times' but was unable to say where he was tased. Officers looked at Defendant's chest and back and did not locate any taser marks" [Doc. 203, p. 11 n.16].

Defendant's objection here is unavailing. While the Court agrees with defendant that he engaged in an altercation with law enforcement that caused injury, and that he was forcibly medicated after his arrest [Doc. 203, p. 10; *see* Doc. 43, p. 12], defendant's reiteration of these facts does not explain how they relate to any physical distress defendant may have felt *during* the interview. As noted, the interview took place approximately 24 hours after defendant had been administered Haldol and after defendant had received medical attention [Doc. 203, pp. 10–11]. While defendant did exhibit physical injuries, as discussed by the R&R [*id.* at 11 n.16], this does not equate to being in physical distress. Without further explanation, defendant's objection to this finding of fact is **OVERRULED**.

Next, defendant disagrees with the R&R's finding that defendant "discussed hallucinations and bizarre beliefs but then noted that he was not experiencing these during the interview itself" [*Id.*]. Defendant asserts that his statements during his interview demonstrate that he "was in fact experiencing bizarre beliefs *during* the interview with law enforcement" [*Id.* at 7 (emphasis in original)]. In particular, defendant cites to the R&R's statement that "[d]efendant . . . expressed concern about his mother and asked officers to check on her to make sure she had not been harmed" [*Id.* at 6 (quoting Doc. 203, p. 11)]. Defendant argues that while this may be technically correct, "[defendant] expressed to law enforcement that he believed that his mother had been killed, that someone was impersonating her and pretending that they were [her], and asked law enforcement [to] see if it was really his mother when they spoke with her" [*Id.*]. Additionally, defendant "continued to tell law enforcement that there were bodies hidden on the property of his

neighbor[,]" even asking law enforcement to take him to search the property and "free souls in the sunlight" [*Id.* at 7].

The Court begins by quoting the R&R's finding of fact defendant is referencing: "Defendant did not state that he was seeing or experiencing anything strange or impossible at the time of the interview" [Doc. 203, p. 12]. The Court concludes such finding to be accurate. While defendant posits that he was "experiencing bizarre beliefs" during the interview with law enforcement, the Court finds that defendant was rather *expressing* bizarre beliefs, and this was noted by the R&R [*Id.* ("[Defendant] told officers that if there were bodies [on his property near his neighbor's property line], he would like for officers to take him to the bodies so he could free their souls.")]. At the time of the interview, defendant did not state or indicate that he was seeing the "bodies" at present, "freeing the souls" at present, or experiencing such a situation during the interview. Instead, defendant referenced the act of "freeing the souls" as something he had done previously, while "out of his mind[,]" and something he would do again if given the chance to accompany law enforcement to the "bodies" he alleged were on his property.

Regarding defendant's statements about his mother, defendant explains during the interview that at a previous time, he and his mother were discussing why his ex-girlfriend had beneficiary papers and papers that were in his mother's house [Interview, 31:11–31:45]. Defendant asserts that his mother stated, "God, was she trying to kill me? And impersonate me? And steal my stuff?" [*Id.* at 31:45–31:55]. Bearing this in mind, defendant states that is why he believed that his mother may have been killed and was currently being impersonated [*Id.* at 31:55–32:00]. Accordingly, the Court does not find

15

defendant's objection to the R&R's finding of fact to be meritorious. Therefore, the objection is **OVERRULED**.

Moving on to defendant's objections to the R&R's analysis, defendant makes four, overall objections.[5]  First, defendant objects to the R&R's findings regarding his alleged illegal seizure, which are that (1) exigent circumstances existed for law enforcement to detain defendant under the community caretaking doctrine; and (2) when defendant was detained, he then resisted or obstructed his detention, which established probable cause for his arrest [Doc. 205, pp. 7–10].  Second, defendant objects to the R&R's finding that (1) the search warrant for his property, and the affidavit offered in its support, established a sufficient nexus between evidence of defendant's illegal activity and defendant's residence and vehicle; and (2) even if the warrant did not establish such nexus, law enforcement relied on the warrant in good faith [*Id.* at 10–12].  Third, defendant lodges a separate objection to the R&R's preceding findings in regard to his vehicle [*Id.* at 12].  Lastly, defendant objects to the R&R's findings regarding his statement to law enforcement on November 11, 2020 [*Id.* at 12–16].  Specifically, defendant objects to the finding that he knowingly, intelligently, voluntarily waived his *Miranda* rights [*Id.*].

In response, the government argues that "[f]or the most part, the defendant's objections are a restatement of the arguments [d]efendant asserted in his motions and at the

---

[5]  The Court acknowledges that defendant has more objections and disagreements within these four, outlined objections. The Court will discuss these internal objections under the respective, general objection within which they fall.

Also, to note, defendant does not appear to make any objection to the R&R's findings regarding excessive force and the suppression of evidence.

suppression hearing[,]" meaning "the objections are improper, and the [C]ourt should overrule them" [Doc. 215, p. 4]. Nonetheless, the government asserts that all the R&R's findings are correct [*Id.* at 1].

## A.    Defendant's Arrest

As previously stated, defendant objects to the R&R's finding that exigent circumstances existed for law enforcement to detain him under the community caretaking doctrine [Doc. 205, p. 7].[6] Further, defendant objects to the R&R's finding that when he was detained, "he then resisted or obstructed his detention, which established probable cause for his arrest for resisting or obstructing" [*Id.*].

In support of his objections, defendant first argues that his detention was not based on reasonable suspicion [*Id.*].[7] Specifically, defendant asserts that testimony and proof at

---

[6]   The R&R, in adopting the previous findings as to these issues, found that "under the totality of the circumstances, exigent circumstances existed for law enforcement to detain [d]efendant to investigate his condition under the community caretaking function" [Doc. 203, pp. 13–14]. In the Order accepting Judge Poplin's R&R [Doc. 43], however, the Court noted that the "precise legal contours of a law enforcement officer's 'community caretaking function' continue to develop" [Doc. 67, p. 1 n.1]. But "because exigent circumstances justified [d]efendant's seizure[,]" the Court found it "need not address those precise contours"[*Id.*]. Thus, in concluding that the warrantless seizure was justified, the Court previously focused solely on the existence of exigent circumstances [*Id.* at 5]. Given the adoption of these findings by the present R&R [Doc. 203], the Court finds it appropriate do to the same here.

Additionally, beyond including the phrase "community caretaking doctrine" in its summary of the R&R's findings, defendant does not make any specific arguments regarding such doctrine. Defendant does reference the community caretaking function in relation to his objection to Judge Poplin's reliance on *Michigan v. Fisher*, 558 U.S. 45 (2009), *see infra*, but Judge Poplin relied on this case in her analysis of exigent circumstances, not the community caretaking function.

[7]   The Court again notes that the R&R adopted the previous findings regarding the issues surrounding defendant's arrest [Doc. 203, pp. 13–14 (citing Doc. 43, p. 18; Doc. 67, p. 5)]. Specifically, in the previous R&R, Judge Poplin found that the Campbell County Sheriff's Office deputes "could properly stop and detain [d]efendant, without probable cause or reasonable suspicion, due to the exigent circumstances . . . ." [Doc. 43, p. 18; *accord* Doc. 67, p. 5]. Further,

17

the suppression hearings showed that officers responded to a 911 call of an individual screaming in the woods, that defendant was likely on his own property when law enforcement arrived, and that there were "no indications of a weapon being present, or any direct threat or risk to anyone at the [neighbor's] residence" [*Id.* at 8]. Taking all of this into consideration, defendant argues that law enforcement did not have reasonable suspicion of a crime when they entered the woods and approached defendant [*Id.*]. There were not, defendant contends, "sufficient specific and articulable facts to establish reasonable suspicion of *any* criminal activity" [*Id.* (emphasis in original)].

In response, the government insists that law enforcement had sound legal basis for encountering defendant, arresting him, and searching him [Doc. 215, p. 6]. Specifically, the government points to information law enforcement had when they arrived on the scene—"[Defendant] had murdered everyone" [*Id.*]. With this information, the officers were justified under *Terry* to investigate further, including asking defendant questions and demanding he come out of the wooded area [*Id.*]. *See Terry v. Ohio*, 392 U.S. 1 (1968). Furthermore, defendant's response to law enforcement, which included actively fighting law enforcement, "led to a justifiable arrest" and search of defendant [*Id.*].

The Court finds defendant's objection and supporting argument to be a reiteration of such arguments he raised in his previous briefings and at the November 4, 2024, hearing

---

when law enforcement attempted to detain defendant, "he obstructed the detention by pushing them away and then fighting with them. At that point, the officers had probable cause to arrest [d]efendant for obstructing the detention" [Doc. 43, pp. 18–19]. Thus, the present R&R adopts findings that conclude that detention was proper *without* reasonable suspicion, though defendant continues to argue such suspicion did not exist. Regardless, the Court will address this objection for thoroughness.

18

[*See* Doc. 187, p. 5 ("In the instant case, officers responded to a 9-1-1 call of an individual in a wooded areas screaming. Upon arrival, officers indicated that they heard a man screaming in the woods, and that based on his statements they believed him to be publicly intoxicated. . . . Officers did not have reasonable suspicion to approach and detain [defendant] on November 10, 2020. . . . Here, [defendant] was located on his property yelling. . . . Additionally, there were no allegations that he had a weapon or was otherwise presenting any risk to himself or others."); Doc. 214, pp. 135–36]. As such, defendant's objection is improper and is in turn, **OVERRULED**.

Next, defendant argues that law enforcement's entry onto his property and his subsequent arrest were "not supported by probable cause and the exigency exception to the warrant requirement was not applicable" [Doc. 205, p. 8]. No testimony at either hearing, defendant asserts, supports the conclusion that the exigent circumstances exception to the warrant requirement was applicable [*Id.* at 8–9]. Defendant maintains that when law enforcement arrived, "there were no obvious signs of injury[,]" "both homeowners were safe," and defendant "was a significant distance from them on his own property in the woods" [*Id.* at 9]. Moreover, when law enforcement spoke to defendant, asking him to come out of the woods, "no indication was given that he was in any way injured[;] in fact his response led officers to believe he was intoxicated, not injured" [*Id.*].

Defendant next turns to Judge Poplin's reliance on *Michigan v. Fisher*, 558 U.S. 45 (2009) in finding the emergency aid exception applicable in his case [*Id.*]. Unlike in *Fisher*, where the defendant was actively bleeding and threatening officers with a weapon, defendant here argues that "there was no evidence of serious injury or threat to a third

19

person that would support the community caretaking function application here" [*Id.*]. Again, defendant reiterates that he gave no indication he was injured to law enforcement and both homeowners were in a safe, distant location from defendant [*Id.*]. Furthermore, defendant contends there is "no support in the testimony of either officer who responded that they believed [defendant] needed medical attention" [*Id.* at 9–10]. And, no threats were being made, and there were no indications of any weapon involvement [*Id.* at 10]. Ultimately, defendant argues that "there was no objective or reasonable basis to believe [defendant] was posing a threat of imminent injury to anyone[,]" the actions of law enforcement were unreasonable, and the community caretaking function and the emergency aid exception are inapplicable here [*Id.*].

Responding in opposition, the government contends that exigent circumstances did in fact exist to justify the warrantless search and seizure of defendant [Doc. 215, p. 6]. The government notes that when law enforcement arrived on the scene, "it was dark and heavily wooded" and they had "information that someone was screaming about dead bodies and murder" [*Id.*]. Additionally, law enforcement could hear defendant shouting, and when law enforcement encountered defendant, he "responded erratically and dangerously to officer commands" [*Id.*]. And, while defendant contends there was no indications of any weapons present, the government counters that law enforcement "was unable to discern immediately" whether defendant had any weapons and that, "coupled with defendant's frantic behavior[,] presented a potential threat to the safety" of defendant and others [*Id.* at 6–7]. The government also notes the R&R's statement that "defendant could have 'posed more of a danger to himself and others by being out of immediate reach of officers and

20

having a higher vantage point than if he were on the ground" [*Id.* at 7 (citing Doc. 203, p. 19)].

The Court first turns to defendant's general objections to the R&R's findings that exigent circumstances existed here to justify the warrantless entry onto defendant's property and the warrantless seizure of defendant. Besides defendant's disagreement with the reliance on *Fisher*, defendant's objections here merely reiterate arguments he has made previously made and which the magistrate already considered [*See* Doc. 187, pp. 8–9 ("Officers responded to a call of a man screaming in the woods . . . . At no point was there any indication that [defendant] was injured, or that anyone in the area was in danger. Further, there was no indication that anyone possessed a weapon, or any other indication that there was a risk to officer safety. . . . There is 'no credible and reliable evidence' that any injuries or potential for injuries necessitated officer action at that moment."); Doc. 214, p. 136 ("[Defendant's] in his own property, up in a tree. They're [law enforcement] supposed to be there to help him.")]. Therefore, defendant's general objection here is **OVERRULED**.

Moving to defendant's objection to the reliance on *Fisher*, defendant attempts to distinguish his case from *Fisher* by using the same arguments for his general objection above (*i.e.*, no evidence or indication of serious injury to defendant or others, no threat to a third person, both neighbors were in a safe location, and there were no indications that any weapons were involved whatsoever). While the Court acknowledges that there are factual differences between this case and *Fisher*, as there would be in most cases, the Court is to look at the totality of the circumstances "[t]o determine whether a law enforcement

21

officer faced an emergency that justified acting without a warrant." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013). Moreover, a reviewing court is to consider the totality of circumstances without regard to law enforcement's subjective intent. *Id.*; *Lange v. California*, 594 U.S. 295, 301 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)) (stating that exigent circumstances apply when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable").

Therefore, while defendant's case presents facts distinct from that of *Fisher*, the Court need not find identical facts to determine that, under the totality of circumstances here, law enforcement was justified in its warrantless entry and seizure of defendant. As noted by the previous Order adopting Judge Poplin's R&R, "the Sixth Circuit has articulated various factors that may bear on whether exigent circumstances exist, including an alarming 911 call, the officers' surroundings, and an individual's reactions to officers' requests" [Doc. 67, p. 4 (citing *Johnson v. City of Memphis*, 617 F.3d 864, 870 (6th Cir. 2010); *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003); *Pryor v. Coffee Cnty.*, No. 4:20-CV-14, 2022 WL 131251, at *8 (E.D. Tenn. Jan. 12, 2022))].

Here, while defendant was not actively bleeding or pointing a weapon at law enforcement as was the defendant in *Fisher*, law enforcement arrived on the scene to respond to a 911 call from a nearby neighbor indicating that a murder may have occurred [Doc. 43, p. 12; Doc. 67, p. 5; *see also* Doc. 47, p. 7 (Testimony of Deputy Tolliver) ("Q. Okay. Was there any indication of possible homicide? A. Yes.")]. The scene itself was a rural, wooded property, and it was still dark outside when law enforcement encountered

defendant, which made it difficult to determine whether defendant had a weapon or not [Doc. 43, p. 12; Doc. 67, p. 5]. Furthermore, defendant was observed moving around in the woods[8] and "screaming that when the sun rose, he would burn to ashes" [Doc. 43, p. 12; Doc. 67, pp. 2, 5 ("The [9-1-1] caller relayed that a man in the wooded area . . . was yelling that 'he was burning' and 'needed help.'"); *see also* Doc. 101, p. 2 ("Campbell County Sheriff deputies were called to perform a welfare check, for a man yelling for help.")].

As to defendant's reaction to law enforcement, when law enforcement announced their presence to defendant, he was aggressive, calling officers obscenities and telling them they "would have to come and get him" [Doc. 43, p. 12; Doc. 67, pp. 2, 5; Doc. 47, p. 11]. The Court also notes that defendant ended up in a tree during his interaction with law enforcement [Doc. 43, p. 12; Doc. 67, p. 2]. Without knowing whether defendant had a weapon, defendant's presence in a tree posed a danger to law enforcement as he was out of their immediate reach and at a higher vantage point [Doc. 203, p. 19]. After considering the totality of the circumstances, the Court concludes as the present R&R does. That is, there was an objectively reasonable basis for the officers to conclude that there were exigent circumstances in existence which justified the warrantless entry onto defendant's

---

[8] The Court notes that during the suppression hearing on November 4, 2024, defendant argued that Deputy Tolliver's account of the encounter, specifically that defendant was not in a tree when law enforcement arrived, could not be the truth [Doc. 214, pp. 136–37]. In his objections, however, defendant states that law enforcement agreed that, "upon arrival, [defendant] was *running around* and had climbed a tree . . . ." [Doc. 205, p. 9 (emphasis added)].

23

Case 3:21-cr-00058-TAV-CRW    Document 224    Filed 03/14/25    Page 23 of 47
PageID #: 1602

property and the warrantless seizure of defendant.[9]  Accordingly, defendant's objection to Judge Poplin's R&R's discussion of *Fisher* is **OVERRULED**.[10]

Lastly, the Court turns to defendant's objection to the R&R's finding that, when defendant was detained, he then resisted or obstructed his detention, which established probable case for his arrest [Doc. 205, p. 7].  Other than voicing a disagreement, defendant presents no explanation for how or why the R&R's finding is incorrect.  Therefore, defendant's objection here is **OVERRULED**.

### B.    Search Warrant for Defendant's Property

Next, defendant objects to the R&R's finding that defendant's possession of more than 60 rounds of ammunition "while located only a short distance from his residence when considering in conjunction with him shouting that he had 'murdered his family' cr[e]ated a fair probability that evidence that [d]efendant illegally possessed weapons and/or ammunition would be located inside the residence" [Doc. 205, p. 10 (quoting Doc. 203, p. 17)].  Defendant also objects to the R&R's subsequent finding that such evidence "might also be found in other places adjacent to [d]efendant's home, including vehicles and

---

[9]  The Court notes defendant's argument that there was no objective evidence of an ongoing emergency or injury to defendant, which defendant states is "supported by the fact that officers immediately assumed that [defendant] was publicly intoxicated" [Doc. 205, p. 9].  The Court finds this unpersuasive.  Even if law enforcement assumed defendant was intoxicated, this does not take away from the other circumstances of this case, (*e.g.*, that the 911 call referenced indicated that murder may have occurred, that it was unclear to law enforcement if defendant had a weapon, in part because of defendant's movement and dark, and that defendant was screaming he would burn to ashes when the sun came up).

[10]  Defendant states that the R&R did not make any separate findings to the warrantless entry onto defendant's property [Doc. 203, p. 8].  The Court acknowledges the absence of separate findings but finds that the exigent circumstances in this case, as discussed *supra*, justify the warrantless entry onto defendant's property as well as the warrantless seizure of defendant.

outbuildings" given that guns and ammunition are both easily concealable in the compartments of a vehicle or a locked storage building [*Id.* (citing Doc. 203, p. 17)]. Lastly, defendant objects to the R&R's finding that, even if the search warrant was lacking a sufficient nexus, it cannot be considered "so lacking" as to render belief in it unreasonable, applying the good faith exception [*Id.* (citing Doc. 203, p. 17)].

Addressing the first two of these objections, defendant argues that "[t]here were no statements in the affidavit about seeing a weapon, using a weapon, or any other indications that [defendant] was in possession of a weapon in the woods" [*Id.*]. And, while the R&R relied on the allegation that defendant stated he had murdered his family "in closing the gap in the warrant here," defendant asserts that "there is no indication that supports the conclusion that [such] fact relates back in any way to the residence at issue" [*Id.*]. In fact, defendant states, there is no mention or discussion of the residence as it relates to defendant's actions or statements [*Id.* at 10–11]. Defendant also notes that during the encounter with law enforcement, he was not at or near his home or vehicle [*Id.* at 11]. Altogether, defendant contends that the affidavit in support of the search warrant in this case "lacked any nexus to the residence it requested to search" [*Id.*].

In response, the government argues that defendant's possession of over 60 rounds of ammunition while on his property "is probable cause that a firearm or other evidence of illegal possession of firearms and ammunition may be found in his residence and adjacent areas" [Doc. 215, p. 7]. The government also emphasizes that a "search warrant can

authorize a broad search (*i.e.*[,] 'premises' which would include vehicles) and still be valid[,]" citing to case law from this circuit and others [*Id.* at 8].[11]

Many of defendant's arguments in support of his objection are ones he previously presented, and thus, they are improper [*See* Doc. 187, p. 12 ("[Defendant] was located in a wooded area a distance from his home, purportedly in the possession of ammunition. There were no statements in the affidavit about seeing a weapon, using a weapon, or any other indications that [defendant] was in possession of a weapon in the woods near his neighbor's home. Additionally, there is no mention or discussion of the home or other indication to believe that evidence would be located there, simply a statement that the address was [defendant's] residence. . . . [T]he affidavit does not contain any nexus to the residence it requested to search."); Doc. 214, p. 138 (Defense Counsel Arguments) ("[Defendant] [was] out in the middle of the woods up in a tree. . . . [T]here's some distance between, my understanding of where [defendant] was arrested and where his home is.")].

However, defendant does appear to present one new argument. Specifically, defendant argues that the R&R relied on the "allegation that [defendant] had 'murdered his family' in closing the gap in the warrant[,]" but "there is no indication that supports the conclusion that [such] fact relates back in any way to the residence at issue" [Doc. 205, p. 10]. To adequately address this objection, the Court begins with the relevant law and a review of the affidavit language.

---

[11] The government makes further argument regarding the search warrant's authorization of the search of defendant's vehicle. The Court includes such response *infra* in its analysis of defendant's separate search warrant objection to his vehicle (*see* Section III(B)(i)).

26

The Fourth Amendment of the United States Constitution protects "against unreasonable searches and seizures[,]" providing accordingly that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)). "A judge presented with a search warrant application is simply required 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Alderson*, No. 3:21-CR-68, 2022 WL 3356025, at *17 (M.D. Tenn. Aug. 12, 2022) (quoting *Brown*, 828 F.3d at 381).

Probable cause exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)). To justify that such probable cause exists, the search warrant affidavit must establish "a nexus between the place to be searched and the evidence sought." *Brown*, 828 F.3d at 381 (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*)). The Sixth Circuit has further explained that

27

the connection [*i.e.*, nexus] between the [place to be searched] and the evidence of criminal activity must be specific and concrete, not vague or generalized. If the affidavit does not present sufficient facts demonstrating why the police officer expects to find evidence in the residence rather than in some other place, a judge may not find probable cause to issue a search warrant. And of course, whether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented.

*Id.* at 382 (citations and internal quotation marks omitted). "[T]he affidavit must suggest that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought and not merely that the owner is suspected of a crime." *Peffer*, 880 F.3d at 270 (internal quotation marks omitted) (quoting *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006)).

As stated by the R&R, "[a] magistrate judge may infer a nexus between the suspect and his residence, depending on 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (quoting *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985)). Further, it is reasonable to suppose "that some criminals store evidence of crime in their homes, even though no criminal activity or contraband is observed there." *Id.* at 686–87. And when it comes to firearms, the Sixth Circuit has "acknowledged that individuals who own guns keep them at their homes," and thus, "a suspect's use of a gun in the commission of a crime is sufficient to find a nexus between the gun that was used and the suspect's residence." *Peffer*, 880 F.3d at 271 (quoting *United States v. Smith*, 182 F.3d 473, 480 (6th Cir. 1999)).

28

"When assessing the validity of a challenged search warrant, the reviewing court must give 'great deference' to the issuing judge's determination, while ensuring that he [or she] 'had a substantial basis for concluding that probable cause existed.'" *Alderson*, 2022 WL 3356025, at *18 (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 238–289 (1983) (alterations omitted)). The reviewing court's assessment of probable cause "is limited to the information presented in the four corners of the affidavit." *Brown*, 828 F.3d at 381 (quoting *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)).

Turning to the present case, the search warrant states in relevant part:

> Proof having been made before by Captain John Long that there is probable case for believing [defendant] has in his possession a weapon/weapons in violation of T.C.A[.] 39-17-1307 Carrying or possession of a weapon: Firearms and/or ammunition for firearms which is an offense for convicted to possess in the State of Tennessee. Said dwelling to be searched and an out buildings, locked or unlocked containers or vehicles on said property located at 7236 Stinking Creek Rd[.,] Pioneer, Tennessee[,] while officers are legally present.

[Doc. 187-2, p. 1]. The affidavit in support of the search warrant states likewise that, based on the investigation, defendant "was found to have upon his person [s]ixty-three (63) rounds of ammunition, and it is the affiant[']s belief that [defendant] has in his possession weapon/weapons at his residence in violation of T.C.A. 39-17-1307 Carrying or Possession of a [W]eapon" [*Id.* at 5].

At the beginning of the affidavit, Captain Long attested that he has been employed by the Campbell County Sheriff's Office for 17 years, and for the past 12 years, he has been working as a detective with the department [*Id.* at 3]. During his career, Captain Long stated he has, amongst other things, "written and assisted in the execution of search

29

warrants" [*Id.* at 3]. As to the facts relating to the investigation of defendant, Captain Long wrote that in November 2020, he learned that Deputy Tolliver had arrested defendant on several offenses, and during the course of arrest, "several rounds of ammunition were discovered on [defendant's] person" [*Id.*]. Captain Long includes a transcript of the arrest report filed by Deputy Tolliver which provides, "On 11/10/2020 at approximately 0553[,] Affiant was dispatched to 7240 Stinking Creek Road in reference to a male screaming he had murdered his family at listed residence" [*Id.* at 4]. The transcript again includes details of the ammunition found on defendant upon his arrest: "Affiant found several rounds of handgun and shotgun ammunition. 63 rounds in total of ammunition. 13 shotgun shells were located in the [d]efendant['s] right pocket. There were 50 rounds of 22 shells located in the [d]efendant['s] left pocket of his jacket" [*Id.*].

As to defendant's assertions that he had murdered his family, Deputy Tolliver stated Deputy Weaver went to defendant's residence to do a property check [*Id.*]. Deputy Tolliver provides that "defendant was alone[,] and no one had been harmed" [*Id.*]. Following the transcript of Deputy Tolliver's arrest report, Captain Long stated that he spoke with Deputy Tolliver regarding the search of defendant's residence, and Deputy Tolliver relayed that "the residence was cleared to make sure that there were no dead bodies within the residence, but [the] search did not include any search for weapons that might be there" [*Id.*]. Captain Long also attested that he obtained copies of criminal court judgment orders from the Campbell County Criminal Court Clerk's Office and "found that [defendant] had been convicted of several violent felonies[,]" including "Aggravated Assault[] and Attempted First Degree Murder" and "Aggravated Assault and

30

Vandalism-$10,000–$60,000" [*Id.*].  Based on these judgment orders, Captain Long stated it was his belief defendant was a convicted felon and unable to legally possess a firearm [*Id.*].

The affidavit here does not provide a "substantial basis for concluding" that there was probable cause to believe that weapons, specifically firearms, would be found in defendant's residence.  *Brown*, 828 F.3d at 381 (citation omitted).  As laid out above, "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'  There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'"  *Carpenter*, 360 F.3d at 594 (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)).  "[T]he affidavit must suggest that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought and not merely that the owner of the property is suspected of a crime."  *McPhearson*, 469 F.3d at 524 (internal quotation marks omitted) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

The affidavit focuses significantly on the fact that when defendant was arrested, he had ammunition on his person, but the affidavit makes no attempt to explain why Captain Long believed that weapons or firearms would be found in defendant's residence.  The fact that an individual is found in possession of ammunition cannot, without more, given rise to an inference that a weapon will be located the residence.  *See Alderson*, 2022 WL 3356025, at *20 ("Just as an individual's 'status as a drug dealer, standing alone, [does not give] rise to a fair probability that drugs will be found in his home," *Brown*, 828 F.3d at

383, the fact that an individual is found in possession of a firearm cannot, without more, give rise to an inference that ammunition will be located at his residence.").

Further, Captain Long does not allege that defendant was known to have purchased firearms, that any witness had seen firearms in defendant's residence, or that anyone had witnessed defendant use a firearm. And, in the affidavit, Captain Long did not attest that, based on his knowledge and experience as an officer or detective, there was a particularized reason to believe that a firearm would be found in defendant's residence. *See United States v. Vanderweele*, 545 F. App'x 465, 469 (finding the magistrate judge had reason to believe a silencer would be found in the defendant's home because, in conjunction with an informant seeing the defendant with a silencer, the affiant stated he was aware, based on his training and experience, "that firearms, ammunition, and related items are commonly stored within the owner or possessor's dwelling").

The question then becomes, as defendant alludes, whether the affidavit's inclusion of defendant's assertion that he had murdered his family establishes the needed nexus. The Court finds it does not. The addition of defendant's assertion alone is not a sufficient fact to demonstrate why Captain Long expected firearms to be found in defendant's residence rather than some other place. *See Brown*, 828 F.3d at 382. And while "a suspect's use of a gun in the commission of a crime is sufficient to find a nexus between the gun that was used and the suspect's residence[,]" because individuals who own guns keep them in their

homes, *Peffer*, 880 F.3d at 271, Captain Long articulates no allegation or inference that defendant used a firearm to commit the murders defendant professed he committed.[12]

Regardless, however, the Court finds that the good-faith exception to the exclusionary rule for evidence applies here.  *Leon*, 486 U.S. at 905.  To aid courts in resolving whether the good-faith exception applies, the Supreme Court in *Leon* "outlined four circumstances in which an officer's reliance on a search warrant would be objectively unreasonable and the evidence procedure by it should, therefore, be excluded." *Alderson*, 2022 WL 3356025, at *19 (citation omitted).  Of these outlined circumstances, only the third appears to be contested here [*see* Doc. 203, p. 17; Doc. 205, p. 11], and in the Court's view, it is the only one potentially applicable to defendant's case: whether the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 486 U.S. at 923 (citation omitted).

The Sixth Circuit has explained that an affidavit that is

> so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a "bare bones" affidavit. A bare-bones affidavit, in turn, is commonly defined as one that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge. Put more simply, a bare-bones affidavit is a conclusory affidavit, one that asserts only the affiant's belief that probable cause existed. It provides nothing more than a mere guess that contraband or evidence of a crime would be found [and is] either completely devoid of facts to support

---

[12]  While acknowledging the crime identified in the warrant to be not homicide, the Court notes that the Sixth Circuit has recognized that "[a]n affidavit sufficiently supports a warrant so long as it provides probable cause to believe evidence of *any crime* will be found in the location to be searched, even if it does not provide probable cause to believe that evidence of the particular crimes listed in the affidavit will be found in the location to be searched." *Id.* at 264 n.3 (emphasis added) (citation omitted).

33

the affiant's judgment that probable cause exists, or so vague as to be conclusory or meaningless.

In contrast, an affidavit is not bare bones if, although falling short of the probable-cause standard, it contains a minimally sufficient nexus between the illegal activity and the place to be searched. If the reviewing court is able to identify in the averring officer's affidavit some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched, then the affidavit is not bare bones and official reliance on it is reasonable.

*United States v. White*, 874 F.3d 490, 496–97 (6th Cir. 2017) (internal quotation marks and citations omitted).

Here, the affidavit is not, as defendant contends, a bare-bones affidavit. The affidavit included details that law enforcement was dispatched to another residence on Stinking Creek Road, and when law enforcement arrived, defendant was heard screaming that he had murdered his family [Doc. 187-2, p. 4]. And upon his arrest, as the affidavit stated multiple times, defendant was found to be in possession of numerous rounds of ammunition [*Id.* at 3–5]. Further, the affidavit included defendant's status as a convicted felon [*Id.* at 4]. From these facts, the Court, the reviewing court, can identify a connection between the criminal activity at issue and the place to be searched. Specifically, from the combination of defendant's proclamation of homicide with the discovery of ammunition on his person shortly thereafter, it would be reasonable to believe an offense had been committed and that evidence thereof, specifically a firearm that facilitated a homicide, would be found in defendant's residence. *See Williams*, 544 F.3d at 688 (citations omitted) ("[A]n issuing judge may infer that a criminal suspect keeps the 'instrumentalities['] . . . of his crime in his residence"); *see also Peffer*, 880 F.3d at 271 ("[A] suspect's use of a

34

gun in the commission of a crime is sufficient to find a nexus between the gun that was used and the suspect's residence."); *United States v. Lingo*, No. 2:20-CR-33, 2020 WL 8485028, at *3 (E.D. Tenn. July 13, 2020), *report and recommendation adopted,* No. 2:20-CR-33, 2021 WL 75006 (E.D. Tenn. Jan. 8, 2021) (stating if the defendant had been involved in the victim's murder it was "reasonable to think that [d]efendant might have other evidence relevant to the crime at his home, such as a murder weapon"). Conjoining such belief with defendant's convicted felon status, it is reasonable to believe that any firearms possessed within defendant's residence were illegally possessed.

Ultimately, the Court would agree with defendant's objection that the affidavit in support of the search warrant in this case did not contain the necessary nexus to establish probable cause. Accordingly, pursuant to 28 U.S.C. § 636(b)(1)(C), the Court **MODIFIES** the findings made by Judge Wyrick such that the R&R's analysis of the search warrant's validity is replaced by the Court's above analysis. The Court's agreement with defendant's objection, however, is inconsequential due to the finding that the good-faith exception applies here. Therefore, the Court need not rule on this particular objection. However, regarding defendant's objection to the application of the good-faith exception here [*see* Doc. 205, p. 12], such objection is **OVERRULED** in light of the above analysis.

### i. Defendant's Vehicle

As noted above, defendant lodges a separate objection to the search of his vehicle, remarking that the R&R "seems to have included the search of [defendant's] vehicle within the same logic addressing suppression related to the search" of defendant's property [Doc. 205, p. 12 (citing Doc. 203, pp. 14–17)]. Defendant states that there are "no specific

references to the vehicle or discussion of the scope of the search outside mention that it is 'reasonable to infer' evidence might be in locations other than the residence such as . . . vehicles" [*Id.*]. Further, defendant argues that the affidavit in support of the search warrant contains no mention of defendant driving a vehicle on the date in question, defendant having a valid license, or "any connection to any specific vehicle whatsoever" [*Id.*]. Thus, even if the Court were to find a sufficient nexus related to the search of the residence, the same cannot be said for the vehicle at the property [*Id.*].

In response to defendant's vehicle-specific objection, the government cites to *United States v. Stephens*, 602 F. Supp. 3d 990 (W.D. Ky. 2022), *aff'd*, No. 23-5258, 2024 WL 712492 (6th Cir. Feb. 21, 2024) [Doc. 215, p. 8]. Specifically, the government highlights that in *Stephens*, the court noted "that unpublished Sixth Circuit cases have held that a warrant that authorizes the search of a certain premises usually includes any vehicles within its curtilage if the item to be seized might be found in vehicles" [*Id.* (citing *Stephens*, 602 F. Supp. 3d at 994)]. And here, the search warrant language specifically includes vehicles on the premises [*Id.*]. The government further argues that the magistrate judge issuing the warrant was "entitled to infer that further evidence of defendant's crime . . . would be found on the property[,]" particularly in light of defendant's possession of ammunition on his own property and the little time that elapsed between defendant's arrest and the issuance of the warrant [*Id.* at 8–9].

The R&R here, regarding defendant's vehicle, stated it was reasonable to infer that evidence of a crime, here weapons and/ammunition, "might also be found in other places adjacent to [d]efendant's home, including vehicles[,] . . . given that both guns and

36

ammunition are easy to conceal inside the many compartments of a vehicle" [Doc. 203, p. 17]. Although the Court focused its above probable cause and good-faith exception analysis in relation to defendant's residence, the Court finds the adoption of such findings here in relation to defendant's vehicle to be appropriate, specifically when a magistrate judge may infer a nexus depending on "the type of crime being investigated, the nature of things to be seized, . . . and the *normal inferences that may be drawn as to likely hiding places*." *Williams*, 544 F.3d at 687 (citations omitted) (emphasis added).

Additionally, upon review of the defendant's objection, the Courts finds it to be a reiteration of his previous arguments [Doc. 187, p. 13 ("The affidavit makes no mention of any vehicles whatsoever. There is no discussion of [defendant] driving a vehicle at any point. Simply put, there is no probable cause or nexus related to the search of the Toyota Truck located at the residence. . . . There is no mention of [defendant] driving a vehicle, having a valid license, or being otherwise connected to any vehicles on November 10 or at any point.")]. Therefore, defendant's objections are improper and in turn, are **OVERRULED**.

### C. Defendant's Statement to Law Enforcement

### i. Knowing and Intelligent Waiver

Turning to defendant's statement to law enforcement following his arrest, defendant objects to the R&R's overall finding that he knowingly and intelligently waived his *Miranda* rights [Doc. 205, p. 12]. Within this objection, defendant first appears to take issue with the R&R's assertion that a written *Miranda* waiver is not required [*Id.*]. Specifically, while defendant admits this assertion to be true, he urges that the "absence of

37

a waiver is certainly one factor that the Court may consider in determining if a waiver was knowing and intelligent under the totality of the circumstances[,]" and here, no written waiver was present [*Id.* at 12–13]. Defendant does not cite to any authority in support of his assertion, nor does his statement declare that a Court is *required* to take the absence of a written waiver into account in its analysis of whether a waiver is knowing and intelligent. Therefore, defendant's objection, to the extent there is one here, is **OVERRULED**. *See also North Carolina v. Butler*, 441 U.S. 369, 373 ("The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.").

Defendant next objects to the R&R's finding that there was no evidence to suggest that he was subjected to any sort of physical punishment related to his interrogation [Doc. 205, p. 13 (citing Doc. 203, p. 23]. Defendant states that the R&R held "that there was no support for the conclusion [defendant] had been 'severely beaten'; that that would have been apparent to law enforcement; or that it would have affected his ability to knowingly and intelligently waive his rights" [*Id.* (citing Doc. 203, p. 23 n.24)]. Defendant disagrees with these holdings, arguing that while there was no exertion of physical force on defendant *during* the interview, law enforcement had exerted physical force on defendant within the 24 hours prior to the interview, and defendant had fallen from a tree [*Id.*]. The record is clear, defendant contends, that Captain Long and Agent Elkins were aware that defendant had been in an altercation and that he had been injured, even commenting on his appearance during the interview and inquiring as to if defendant had received medical care [*Id.* at 13–14]. Given this, defendant argues that "there is uncontroverted proof that he was

38

beaten[,] and that law enforcement was fully aware of that when they undertook an interview" with defendant [*Id.* at 14].

In response, the government states that defendant is attempting to attribute "the actions of the arresting officers on the previous day to the interviewing officers much later" [Doc. 215, p. 11]. Defendant's arguments, the government contends, are undermined "by the nature of the recorded statement and the delay in interviewing the defendant" [*Id.*]. Specifically, law enforcement waited over 24 hours to interview defendant, after he was treated for his injuries and sedated [*Id.*]. Thus, "defendant cannot show that there is any causal relationship between the arresting officers and the later interview" [*Id.*].

As noted above, defendant takes issue with the R&R's finding that there was no support for the conclusion that defendant was "severely beaten" [Doc. 205, p. 13]. Specifically, the R&R found that "[t]he injuries that officers testified to observing on [d]efendant's body when they interrogated him do not align with [d]efendant's assertion that he had been severely beaten" [Doc. 203, p. 23 n.24]. Defendant here reiterates his arguments of the physical force law enforcement used on him prior to his interview in support of his objection [*See* Doc. 187, p. 16 ("[Defendant] had been drugged, beaten, tased, and involuntarily medicated in the 24 hours prior to his interrogation. . . . [O]fficers were aware that [defendant] had been beaten repeatedly by arresting officers when he was taken into custody as corroborated by his visible injuries, necessary medical treatment, and [defendant's] statements."); Doc. 187-4; Doc. 187-6; Doc. 214, pp. 141–42 ("It is undisputed that [defendant] was tased, that [defendant] was beaten. Mr. Broyles said in the statement that's in the record he got the hell beat out of him for 10 minutes. . . . He fell out

of a tree. . . . The medical records show he had an EKG, his jaw x-rayed.")].  Therefore, defendant's disagreement with the R&R's characterization of defendant's injuries, supported only by previously presented arguments, is **OVERRULED**.[13]

Next, defendant disagrees with the R&R's finding that there was nothing to support the conclusion that law enforcement was aware of defendant being "severely beaten" [Doc. 205, p. 13].  The Court finds that defendant misunderstands the R&R's holding.  The R&R found that defendant did not "point to any injuries that could have affected his *cognitive abilities* and, even if he had sustained such injuries, does not describe how they would have been readily apparent to Agent Elkins and Captain Long" [Doc. 203, p. 23 n.24 (emphasis added)].  Foregoing defendant's characterization of being "severely beaten," the R&R clearly states that Agent Elkins and Captain Long testified to observing injuries on defendant's body [*id.*], that defendant exhibited physical injuries during the interview [*id.* at 11 n.16], and that Captain Long testified that "before the interview he had spoken to the arresting officers about the events surrounding [d]efendant's arrest and had been advised there was a physical altercation between them and [d]efendant where a taser was used" [*Id.* at 7].  Defendant here appears to conflate the physical injuries defendant had, which were apparent to law enforcement, with any cognitive injury defendant would have had from said physical injuries.  The latter, the R&R found, was not readily apparent to law

---

[13]  Notably, defendant does not address what Agent Elkins or Captain Long testified to observing on defendant's body during the interview.

enforcement during the interview, nor did defendant present any argument as to how these would have been apparent. Accordingly, defendant's objection is **OVERRULED**.[14]

Lastly, defendant disagrees with the R&R's conclusion that defendant being "severely beaten" would not have affected his ability to knowingly and intelligently waive his rights [Doc. 205, p. 13]. Beyond discussing the injuries defendant sustained in his altercation with law enforcement, and discussing the interviewing officers' awareness of such injury, defendant does not explain how the R&R's finding was incorrect. Moreover, defendant fails to explain, as he did prior to the R&R's issuance, how defendant's injuries affected his ability to knowingly and intelligently waive his *Miranda* rights. Therefore, defendant's disagreement with the R&R's finding here is **OVERRULED**.

Defendant also objects to the R&R's finding that defendant was lucid and otherwise coherent during his interview, relying on defendant's ability to recall details of the prior day accurately and defendant's agreement that some of his experienced visions were likely not real [Doc. 205, p. 14 (citing Doc. 203, pp. 23–24)]. Specifically, defendant objects to such finding because of the R&R's reliance on *United States v. Jones*, No. 90-3693, 1991 WL 105751 (6th Cir. June 18, 1991) and *United States v. Dunn*, 269 F. App'x 567, 2008 WL 698940 (6th Cir. 2008), both of which defendant argues are distinguishable from his case [*Id.*].[15]

---

[14] The Court also notes that law enforcement's awareness of defendant's injuries was previously argued by defendant [Doc. 187, p. 16 ("[O]fficers were aware that [defendant] had been beaten repeatedly by arresting officers . . . .")].

[15] Defendant also notes that the R&R did not include that defendant had informed law enforcement that he had been drugged the previous day in its involuntary intoxication analysis [*Id.*]. The R&R does, however, acknowledge this fact in other portions of its overall analysis of

41

Turning first to *Jones*, defendant states that, contrary to his case, "the only proof that the defendant was intoxicated was his testimony, leaving the court with a pure credibility determination on the issue of intoxication" [*Id.*]. Here, however, "there is undisputed proof through both medical records and witness testimony" that defendant was acting bizarrely upon arrest, that defendant believed he had been drugged, that defendant was restrained and forcibly medicated, and that defendant continued to reiterate and affirm many strange beliefs during the interview [*Id.*]. Thus, defendant argues, "[t]his is not simply a credibility determination as the one in *Jones* [*Id.*].

Moving to *Dunn*, defendant states that the court found the defendant's waiver to be valid despite his use of marijuana and Vicodin [*Id.* (citing *Dunn*, 2008 WL 698940, at *4)]. However, unlike in defendant's case, the *Dunn* defendant testified that he regularly used marijuana and that he was typically under the influence for the majority of his life decisions [*Id.* (citing *Dunn*, 2008 WL 698940, at *4)]. Here, on the other hand, defendant believed he had been drugged with "something significant" that was "out of the norm for [him]" [*Id.* at 15]. And moreover, defendant was administered prescription antipsychotic medication before his interview, which he had not taken previously [*Id.*]. Taking these distinctions

_____

whether defendant knowingly and intelligently waived his *Miranda* rights [*See* Doc. 203, p. 23 ("Defendant's suggestion that he [sh]ould be drug tested to find out what drugs were in his system which would have made him experience such hallucinations further demonstrates that . . . [d]efendant was lucid at the time of his interview.")]. Additionally, many of the R&R's conclusions are also applicable to defendant's assertion that he was drugged the day prior to his interview [Doc. 203, p. 24 (stating defendant did not "demonstrate any physical impairments such as slurred speech or drowsiness" or "exhibit sufficient signs of intoxication for officers to determine he was impaired)].

into account, in conjunction with the underlying facts of this case, defendant argues he was "not in a position to knowingly and intelligently waive his rights" [*Id.*].

In response, the government states that defendant's arguments are merely reiterations, and that "defendant cannot show that he was incapacitated at the time of his interview" [Doc. 215, p. 9].

While defendant notes distinctions between his case and the ones cited by the R&R, defendant does not explain how the distinct circumstances under which he gave his statement merit a different result. Moreover, turning to defendant's argument related to *Jones*, the Court is unpersuaded that the question of defendant's intoxication is "not simply a credibility determination" [Doc. 205, p. 14]. While defendant submits that there was independent proof of his "intoxication," neither defendant's forcible medication the day before the interview nor his statements that he believed he had been drugged prior to his arrest equate to a finding that defendant was intoxicated *during* the interview itself. If anything, these instances demonstrate that defendant was "intoxicated" or under the influence at times removed from the interview period.[16] Moving to the *Dunn* case, defendant does not explain how his unfamiliarity with the drugs that were at one point in his system changes the intoxication analysis, particularly in light of the dispute of whether

---

[16]  *See also United States v. Jones*, No. 3:07-CR-35, 2009 WL 77449, at *3 (E.D. Tenn. Jan. 8, 2009) (finding the defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights, despite the defendant being medicated with prescription drugs between his overdose and the interview with law enforcement, in part because "none of the individuals who observed defendant near the time of interview opined that defendant's ability to make [such] waiver of his rights was affected by the influence of drugs or a weakened mental state"); *United States v. Montgomery*, 621 F.3d 568, 573–74 (6th Cir. 2020) (discussing cases within the Sixth Circuit and other jurisdictions that have upheld *Miranda* waivers despite drug impairment).

43

defendant was still feeling the effects of such drugs during his interview. Accordingly, defendant's objections here are **OVERRULED**.

### ii. Voluntary Waiver

Defendant lastly objects to the R&R's finding that, based on the totality of the circumstances, his waiver of *Miranda* was voluntary [Doc. 205, p. 15]. Focusing on coercion, defendant states that "[w]hen interrogating officers know or reasonably should know that a defendant is under the influence of drugs or alcohol, a 'lesser quantum of coercion' is necessary to call a confession into question" [*Id.* (quoting *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002))]. Further, defendant asserts that "the Sixth Circuit has held that a court must consider alcohol's impact on the voluntariness of a confession on a 'case-by-case basis and in view of other circumstances at play'" [*Id.* (quoting *United States v. Montgomery*, 721 F.3d 568, 572 (6th Cir. 2010))].

Taking these statements of law into consideration, defendant contends that the R&R improperly limited its application of the totality-of-the-circumstances test to a "one-hour time frame, rather than examining the entire interaction with law enforcement experienced by [defendant] in a 24-hour period" [*Id.* at 16]. And by doing so, the R&R failed to consider many other relevant factors such as defendant's assault and forcible medication by the same agency that interviewed him [*Id.*]. In total, defendant argues that the facts of this case are unique and are sufficient to establish that defendant's "capacity for self-determination was critically impaired" during the interview with law enforcement [*Id.* (quoting *Sckneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973))].

44

The government, in response, states that, while defendant may have suffered an impairment to his cognitive or volitional capacity, there must also be police coercion to warrant suppression or exclusion [Doc. 215, p. 10 (citations omitted)]. Defendant, the government asserts, cannot show that his statement to law enforcement was coerced [*Id.* at 11]. First, the government points out defendant's criminal history and time spent in prison, arguing that this experience makes it less likely that he was coerced into making a statement given his understanding of the criminal justice system [*Id.* at 10]. Next, the government notes that defendant was interviewed more than 24 hours after his arrest, and during his interview, defendant was clearly and carefully advised of his *Miranda* rights [*Id.*]. And defendant stated he understood his rights [*Id.* at 11]. The government further emphasizes that defendant told law enforcement "calmy and clearly" that he wanted to speak with him, and defendant did "not express confusion or ask the officers to explain what was happening" [*Id.*]. Law enforcement, the government states, did not badger defendant or threaten him; in fact, law enforcement inquired about defendant's health and if he had received care [*Id.*].

Even if the Court were to consider defendant's hectic arrest and forcible medication in its totality-of-the-circumstances analysis of defendant's *Miranda* waiver, the Court would still find that "the threshold requirement of police coercion to establish the involuntariness of [d]efendant's confession ha[s] not been met" [Doc. 203, pp. 27–28]. "The coercion inquiry looks to several potential considerations: the age, education, and other characteristics of the suspect; whether the suspect was advised of his *Miranda* rights; the length of questioning; and the use of physical punishment or the deprivation of food,

45

sleep, or other creature comforts." *Wesson v. Shoop*, 17 F.4th 700, 704 (6th Cir. 2021). As discussed already in the R&R, many of these factors weigh against coercion such as defendant's age, his prior criminal history, and the short length of questioning. And specifically considering the factors defendant emphasizes, the Court finds no means employed by law enforcement calculated to break his will while in the interview. There is no evidence that defendant's "will [was] overborne and his capacity for self-determination critically impaired because of coercive police conduct." *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (citation omitted) (internal quotation marks omitted).

First, defendant's interview with law enforcement took place approximately 24 hours *after* he had been restrained administered Haldol and more than 24 hours *after* he had been arrested [Doc. 203, pp. 10–11]. This temporal space diminishes the coercive effects, if any, that defendant's arrest and forcible medication may have had on the interview itself. Additionally, these actions by law enforcement 24 hours before defendant's interview cannot be said to be "calculated to break his will" during any such interview. *See Spring*, 479 U.S. at 574. Furthermore, during defendant's interview, he appeared to express an eagerness to discuss the incidents leading up to his arrest with law enforcement because of his belief that his ex-girlfriend and others stole his mother's keys, were on his mother's property, and drugged him. Accordingly, the Court concludes that defendant's statements to police were made as a free and deliberate choice. *See Spring*, 479 U.S. at 573 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)) ("[T]he relinquishment of the right must have been voluntary in the sense that it was a product of

46

a free and deliberate choice rather than intimidation, coercion, or deception.").  Therefore,

defendant's objection is **OVERRULED**.

IV.    **Conclusion**

For the reasons above, defendant's objections [Doc. 205] are **OVERRULED**.  The

Court **MODIFIES in part** and **ACCEPTS in part** the R&R [Doc. 203] and **DENIES**

defendant's motions to suppress [Docs. 101, 187].

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE
